STATE OF NORTH CAROLINA v. JAMES FLOYD DAVIS

No. 452A96

(Filed 9 October 1998)

### 1. Jury § 219 (NCI4th)— first-degree murder—jury selection—beliefs regarding the death penalty

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution by excusing prospective jurors for cause based on their beliefs regarding the death penalty. Each prospective juror excused stated that he or she would be unable to follow the law and recommend a sentence of death even if that was what the facts and circumstances suggested.

### 2. Constitutional Law § 343 (NCI4th)— first-degree murder—competency hearing—ex parte—no state constitutional violation

A first-degree murder defendant's state constitutional right to be present at every stage of his capital proceeding was not violated by entry of an amended order concerning his evaluation for competency to stand trial where the order appears to have been entered upon motion of Dorothea Dix Hospital, not the State; the order does not indicate that the State took part in the hearing; and the purpose of a competency evaluation is to determine whether defendant is competent to stand trial, does not implicate

defendant's confrontation rights, and does not have a substantial. relation to his opportunity to defend. Article I, Section 23 of the North Carolina Constitution.

**3. Constitutional Law § 343 (NCI4th)— first-degree murder—right to be present—ex parte competency hearing—no federal constitutional violation**

A first-degree murder defendant's federal constitutional right to be present at every stage of his capital trial was not violated by an *ex parte* hearing concerning his evaluation for competency to stand trial where the order appears to have been entered upon motion of the hospital, not the State, it is not clear that an *ex parte* hearing actually occurred, and, even if it did, it did not deny defendant an opportunity for cross-examination or necessitate his presence to assure fairness in the proceedings.

**4. Criminal Law § 514 (NCI4th Rev.)— first-degree murder—competency to stand trial—hearing—record**

There was a sufficient record for appellate review and defendant did not establish a violation of N.C.G.S. § 15A-1241 in a first-degree murder prosecution regarding the evaluation of his competency to stand trial. There is nothing in the record to suggest that the court conducted a hearing concerning Dorothea Dix Hospital's request to amend the competency evaluation order, a full record exists concerning the hearing on the State's motion for a competency evaluation, and the order entered by the trial court contains all required findings.

**5. Constitutional Law § 262 (NCI4th)— first-degree murder—evaluation of competency to stand trial—right to counsel**

A defendant in a capital first-degree murder prosecution was not deprived of his constitutional rights to counsel in a proceeding to determine his competency to stand trial where an order was entered pursuant to a request by Dorothea Dix Hospital to assign a specific forensic evaluator and to transfer defendant to Dorothea Dix Hospital but there is no proof that an actual proceeding took place. The amended order does not affect defendant's right to a fair trial.

STATE v. DAVIS

[349 N.C. 1 (1998)]

**6. Constitutional Law § 98 (NCI4th)— first-degree murder— competency evaluation—cumulative effect of alleged errors—no due process violation**

There was no violation of a defendant's due process rights in a capital first-degree murder prosecution due to the cumulative effect of alleged errors surrounding the evaluation of defendant's competency to stand trial.

**7. Constitutional Law § 264 (NCI4th)— first-degree murder—evaluation of competency to stand trial—no right to counsel**

A defendant in a capital prosecution for first-degree murder was not denied his Sixth Amendment right to counsel where the court ordered a competency evaluation by a forensic evaluator but declined to allow defense counsel to be present during the examination. Defendant had no constitutional right to have counsel present during his evaluation; the expert in forensic psychiatry who was the evaluator testified that defense counsel's presence would interfere with the process. Furthermore, it was upon motion of defense counsel that defendant was committed for examination of his capacity to proceed.

**8. Criminal Law § 181 (NCI4th Rev.)— first-degree murder—capacity to stand trial—sufficiency of evidence**

The trial court did not err in a capital first-degree murder prosecution by finding that defendant had the capacity to stand trial where the testimony of an expert in forensic psychiatry clearly indicates that defendant met each prong of the competency test set forth in N.C.G.S. § 15A-1001. The evidence must demonstrate that defendant is capable of understanding the nature and object of the proceedings against him, comprehending his own situation in reference to the proceedings, and assisting in his defense in a rational and reasonable manner.

**9. Criminal Law § 468 (NCI4th Rev.)— first-degree murder—prosecutor's argument—defendant's mental competence—defendant's understanding of his rights**

There was no gross impropriety requiring intervention *ex mero motu* in the prosecutor's opening statement and closing argument in a capital first-degree murder prosecution where defendant contended that the jury could infer defendant's mental competence from the State's argument that defendant understood his rights. The prosecutor never directly asked the jury to

use defendant's statements to law enforcement officers in determining his competence or sanity, the prosecutor's comments did not indicate that defendant exercised his right to counsel or to silence, and the trial court instructed the jury that it was to be guided by its own recollection of the evidence.

**10. Evidence and Witnesses § 264 (NCI4th)— first-degree murder—character of victim—relevant**

The trial court did not err in a capital prosecution for first-degree murder by admitting evidence of the victim's character and temperament where the victim had informed defendant that his employment was being terminated as a result of an altercation, defendant returned to the facility with a rifle and killed several people, and defendant contended that the victims had not been willing to assist him and had tried to ruin him. The prosecution was properly permitted to present evidence of the victim's temperament and management style in order to prove the circumstances of the case. As the evidence was properly admitted during the guilt phase, its reconsideration during the sentencing phase was also proper, and did not unduly prejudice defendant.

**11. Evidence and Witnesses § 920 (NCI4th)— first-degree murder—conversation between victim and defendant prior to murders—admissible**

The trial court did not err in a capital prosecution for first-degree murder by admitting evidence of what a victim and defendant had said in a meeting two days prior to the murder at which the victim had terminated defendant's employment. The conversation showed the circumstances of the crime, particularly the motive for the killings. The State is entitled to prove the circumstances of the crime and to introduce evidence tending to support the theory of the case.

**12. Evidence and Witnesses § 920 (NCI4th)— first-degree murder—conversation between victim and defendant— admissible**

The trial court did not err in a capital prosecution for first-degree murder by admitting the testimony of a coworker of defendant and the victim who was present at defendant's dismissal conference before defendant returned and began shooting. The State never offered the statements to prove the truth of the matter asserted, but to prove defendant's motive for the crime.

STATE v. DAVIS

[349 N.C. 1 (1998)]

**13. Evidence and Witnesses § 735 (NCI4th)— first-degree murder—conversation between defendant and victim—not unduly prejudicial**

Testimony relating a conversation between a first-degree murder defendant and his victim at which the victim terminated defendant's employment was highly relevant to the motive of the case and its probative value was not outweighed by the danger of unfair prejudice.

**14. Evidence and Witnesses § 3195 (NCI4th)— first-degree murder—State's witnesses—prior written statements— read into the record**

The trial court did not err in a capital prosecution for first-degree murder by allowing the State's witnesses to read into the record their prior written statements where the statements were not offered to prove the truth of the matter asserted, but to bolster the testimony given by two of the witnesses. The statements were given by the witnesses immediately after the shooting occurred, were thus present sense impressions, and added weight and credibility to the witnesses' trial testimony.

**15. Evidence and Witnesses § 3195 (NCI4th)— first-degree murder—reading of witness's prior statement—no plain error**

There was no plain error in a capital first-degree murder prosecution in the reading of a witness's prior written statement where the objection at trial was general and specific statements were identified for the first time on appeal. A review of the evidence reveals that this is not the exceptional case where such a pervasive defect or plain error occurred which would have tainted all results and denied defendant a right to a fair trial.

**16. Evidence and Witnesses § 2080 (NCI4th)— first-degree murder—defendant's mental condition—jail nurse's opinion**

The trial court did not err in a capital prosecution for first-degree murder by excluding a jail nurse's opinion of defendant's mental condition where the question called for the lay witness to make a psychiatric diagnosis. No foundation had been laid to show that he had the expertise to make such a diagnosis and, while it may have been appropriate for the witness to make a general observation that a defendant appeared "mentally disturbed" upon admission to jail, it was beyond his ability as a lay witness

to make a specific diagnosis as to defendant's being "psychotic." N.C.G.S. § 8C-1, Rule 701.

**17. Constitutional Law § 346 (NCI4th)— first-degree murder—defendant's right to testify—instruction by court to defendant—no plain error**

There was no plain error in a capital first-degree murder prosecution where the court instructed defendant that he had the right to testify, but that if he did he would be subject to cross-examination on a wide variety of subjects, subject only to the discretion of the court and relevancy. The court did not attempt to give defendant detailed instructions concerning the scope of cross-examination, did not give an instruction inconsistent with any of the rules of evidence, and did not impermissibly chill defendant's right to testify.

**18. Homicide § 244 (NCI4th)— first-degree murder—specific intent to kill—evidence sufficient**

The trial court did not err in a capital first-degree murder prosecution by failing to dismiss the charge as to a particular victim based upon insufficient evidence that defendant possessed the specific intent to kill that victim where defendant was discharged from his employment, purchased a semi-automatic weapon the morning of the killings, drove to the facility and killed two others who had been involved in his dismissal in a break room, proceeded down a hallway firing shots into offices, this victim was working at his desk and dove underneath the desk to avoid the shots, defendant fired at least three rounds through the office door, one penetrated this victim's wrist and proceeded through his body, defendant stood in a doorway smoking a cigarette while his victims bled to death, and there was no evidence that this victim had provoked defendant. Although defendant's argument appears to be that he had no motive to murder this victim, motive is not an element of first-degree murder and a jury could reasonably find that defendant formed the requisite premeditation and deliberation based upon the doctrine of transferred intent.

**19. Homicide § 469 (NCI4th)— first-degree murder—specific intent—instructions on mental capacity—no plain error**

There was no plain error in a capital first-degree murder prosecution in the court's instructions on lack of mental capacity regarding specific intent where the court used the phrase "lack of

diminished capacity" as opposed to "lack of mental capacity." The use of the phrase "lack of diminished capacity" appears to be a mere *lapsus linguae*, the court correctly defined the defense, and, read contextually, the instructions properly conveyed to the jury what it must find for the defense to apply.

**20. Homicide § 520 (NCI4th)— first-degree murder—instructions—consideration of second-degree murder**

The trial court in a capital first-degree murder prosecution properly conveyed the mandatory nature of its instruction that the jury would consider second-degree murder if it found that defendant could not form the specific intent required for first-degree murder.

**21. Homicide § 678 (NCI4th)— first-degree murder—diminished capacity defenses—instructions—no error**

The trial court did not err in a first-degree murder prosecution in its instructions regarding defendant's diminished capacity defense where defendant contended that the instructions gave the jury the option of finding defendant not guilty if it found that he lacked the mental capacity to commit murder, rather than requiring such a verdict, but the instructions correctly stated the jurors' obligations when read in context.

**22. Homicide § 478 (NCI4th)— first-degree murder—doctrine of transferred intent—evidence sufficient to support instruction**

The evidence in a capital prosecution for first-degree murder was sufficient to support the transferred intent instruction given by the trial court where defendant returned to his workplace with a rifle after being terminated, headed straight for the hallway where all of the management offices were located, fired into the doors of offices, and, in his statements to law enforcement officials, stated that the people at the facility had set him up, fired him, and ruined him. The evidence demonstrated that defendant's actions were aimed at the employees of the company, particularly those who were involved in management, and this victim was working inside management's offices during the shooting.

**23. Homicide § 478 (NCI4th)— first-degree murder—transferred intent—instructions—no plain error**

There was no plain error in a capital prosecution for first-degree murder in the trial court's instructions on transferred intent where defendant contended that the instruction was flawed because it did not specify whom defendant intended to kill. The evidence indicates that defendant sought revenge from the management of his former employer because of his allegedly unjustified dismissal and the jury was properly instructed on the doctrine of transferred intent based on his intent to harm the management of the company.

**24. Criminal Law § 1335 (NCI4th Rev.)— capital sentencing— hearsay testimony—no error**

There was no error in a capital sentencing proceeding where defendant contended that defendant's sister was allowed to give hearsay testimony but the jurors heard defendant's sister deny any knowledge of the conversation about which the prosecutor asked and no improper testimony was admitted.

**25. Constitutional Law § 352 (NCI4th)— first-degree murder—determination of competency to stand trial—no Fifth Amendment violation**

A capital first-degree murder defendant's Fifth Amendment right to be free from self-incrimination was not violated by the cross-examination at trial of a defense expert regarding the contents of defendant's records from Dorothea Dix Hospital, where he was examined for competency to stand trial. Defense counsel participated in the hearing concerning defendant's competency examination and voiced no opposition to the examination so long as the trial court limited the scope to determination of competency. Defense counsel then sought to rely on the defenses of insanity and diminished capacity during trial and the defense expert testified that in forming his opinion he reviewed defendant's records and referred to the testing done at Dorothea Dix Hospital during the competency examination. The State should not be foreclosed from also relying on that evidence to rebut defendant's contentions.

**26. Constitutional Law § 290 (NCI4th)— first-degree murder—use of information from competency evaluation at sentencing—defense counsel not informed—no denial of Sixth Amendment right to counsel**

Defendant was not denied his Sixth Amendment right to counsel when defense counsel was not notified in advance that the information generated from a competency evaluation would be used against defendant in the sentencing proceeding. Defendant had the opportunity to discuss with counsel the nature of the psychiatric evaluation and defense counsel should have anticipated the use of the psychological evidence by the prosecution in rebuttal to any defense involving defendant's mental status.

**27. Criminal Law § 460 (NCI4th Rev.)— capital sentencing—prosecutor's argument—jury acting on behalf of victims**

The trial court did not err by not intervening *ex mero motu* during the prosecutor's closing arguments in a capital sentencing proceeding where defendant contended that the prosecutor improperly urged the jurors to sentence defendant to death on behalf of the victims, but the prosecutor's remarks only reminded the jury that he was an advocate for the State and the victim and nothing in the prosecutor's argument suggested or implied that the jurors should impose the death penalty because the victims or their families demanded it.

**28. Criminal Law § 475 (NCI4th Rev.)— capital sentencing—biblical arguments**

The prosecutor's biblical arguments in a capital sentencing proceeding were not so improper as to require intervention *ex mero motu* where the prosecutor did not state that the law of this state is divinely inspired or refer to law officers as being ordained by God and, in fact, the argument was a jumble of allusions and catch phrases which were difficult to clearly understand. However, caution is urged in the use of biblical phrases and allusions; it is the prosecutor's duty in closing arguments at the sentencing proceeding to convince the jury that the facts and circumstances of the crime warrant the death penalty and it is not the duty of the prosecutor to preach to the jury.

STATE v. DAVIS

[349 N.C. 1 (1998)]

**29. Criminal Law § 1373 (NCI4th Rev.)— capital sentencing— aggravating circumstances—risk of death to more than one person—instruction that rifle is a deadly weapon—no plain error**

There was no plain error in a capital sentencing proceeding where defendant contended that the court's instruction that an M-1 .30-caliber rifle is a deadly weapon relieved the State of its burden of proving each element of the aggravating circumstance that defendant knowingly created a great risk of death to more than one person by means of a weapon or device that would normally be hazardous to the lives of more than one person. The court's instructions at the guilt phase simply informed the jurors that the rifle constituted a deadly weapon as a matter of law regardless of the weapon's use and the instructions concerning the aggravating circumstance focused on totally separate issues. The fact that a deadly weapon was used is not enough to support a finding that this aggravating circumstance exists. N.C.G.S. § 15A-2000(e)(10).

**30. Criminal Law § 1335 (NCI4th Rev.)— capital sentencing— aggravating circumstances—risk of death to more than one person—evidence used to infer malice during guilt phase**

There was no error in a capital sentencing proceeding where defendant contended that the court erroneously utilized evidence of a deadly weapon during the sentencing proceeding because it also relied on the use of the weapon to infer malice during the guilt phase. Although the Fair Sentencing Act specifically prohibited utilizing evidence necessary to prove an element of the offense to also prove an aggravating factor, the capital sentencing scheme contains no such prohibition and clearly contemplates a sentencing determination based on evidence presented during both the guilt and sentencing phases.

**31. Criminal Law §§ 1373 and 1374 (NCI4th Rev.)— capital sentencing—aggravating circumstances—risk of harm to more than one person—course of conduct—both properly submitted**

There was no error in a capital sentencing proceeding where the court submitted both the aggravating circumstance that defendant knowingly created a risk of death to more than one person by means of a weapon or device that would normally be hazardous to the lives of more than one person and the aggravat-

ing circumstance that the murder was part of a course of conduct which included other crimes of violence against another person or persons. Although defendant argues that the circumstances were based on the same evidence, it has been held permissible to use the same evidence to support multiple aggravating circumstances when the circumstances are directed at different aspects of a defendant's character or the murder. In this case, defendant during a shooting spree sought out the management of a company from which he had been terminated and disregarded the value of every human life in the building as he randomly fired into offices while walking down the hall. That aspect of defendant's character is not fully captured by the (e)(11) aggravating circumstance. There was independent evidence to support each circumstance, although some of the evidence may have overlapped.

**32. Criminal Law § 1346 (NCI4th Rev.)— capital sentencing— consideration of the same evidence to support more than one circumstance—instructions**

There was no plain error in a capital sentencing proceeding where defendant contended that the court erred by failing to instruct the jury that it could not utilize the evidence of one aggravating circumstance to prove another. Although the North Carolina Supreme Court has stated that trial courts should instruct the jury in such a way as to insure that jurors will not use the same evidence to find more than one aggravating circumstance, it has not required that trial courts do so.

**33. Criminal Law § 1381 (NCI4th Rev.)— capital sentencing— mitigating circumstances—value and weight distinguished**

In capital sentencing, the term "value" is found only in the statutory catchall provision, N.C.G.S. § 15A-2000(f)(9), and has also been applied to nonstatutory mitigating circumstances. The term "weight" or "weighing" is used only in N.C.G.S. § 15A-2000(b)(2) and (3), referring to the process of weighing the mitigating circumstances found against the aggravating circumstances found. The term "value" is used under Issue Two and does not enter into either Issue Three or Issue Four.

**34. Criminal Law § 1349 (NCI4th Rev.)— capital sentencing— instructions—mitigating circumstances—value and weight**

There was no error in a capital sentencing proceeding in the instructions concerning valuing and weighing statutory and non-

statutory mitigating circumstances where defendant contended that the court erred by simply instructing the jurors to answer "yes" for a given statutory mitigating circumstance if one or more jurors found that circumstance to exist and was silent about "whether those circumstances were deemed by law to have mitigating value." The only time "value" comes into play is in determining whether the statutory catchall or the nonstatutory mitigating circumstances exist because jurors must first find that they have mitigating value in order to find that they exist. Jurors are not required to find value as to statutory mitigating circumstances, but this does not mean that the trial court is required to instruct that statutory mitigating circumstances have value as a matter of law. The instructions here properly distinguished between statutory and nonstatutory mitigating circumstances, properly instructed the jurors in Issue Three that they must "weigh the aggravating circumstance or circumstances against the mitigating circumstance or circumstance," and required the jurors to give the statutory and nonstatutory mitigating circumstances they had found weight in determining both Issues Three and Four. Furthermore, the trial court properly instructed that the weight to be given each mitigating circumstance is for the individual juror to decide.

**35. Criminal Law § 1345 (NCI4th Rev.)— capital sentencing— response to jurors' questions—reinstruction**

The trial court did not err in a capital sentencing proceeding by electing in response to jurors' questions to reinstruct the jurors in the pattern jury instructions in an attempt to avoid a misstatement of the law. When viewed as a whole, the trial court's instructions properly informed the jurors of their duties under the law.

**36. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not arbitrary**

The evidence in a capital sentencing proceeding supported each aggravating circumstance found and the sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor.

**37. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not disproportionate**

A sentence of death for first-degree murder was not disproportionate where defendant was convicted of three counts of

**STATE v. DAVIS**

[349 N.C. 1 (1998)]

first-degree murder, was convicted on a theory of malice, pre-meditation, and deliberation, and the evidence showed that defendant engaged in a shooting rampage at his former work-place which resulted in the murder of three employees, as well as the wounding of two others. He fired multiple rounds from two semi-automatic weapons throughout the facility as employees hid under desks or fled the building in fear for their lives. With the killings completed, defendant stood in the doorway, smoking a cigarette.

Justice WYNN did not participate in the consideration or deci-sion of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from three judgments imposing sentences of death entered by Payne, J., on 1 October 1996 in Superior Court, Buncombe County, upon jury ver-dicts of guilty of first-degree murder. Heard in the Supreme Court 27 May 1998.

*Michael F. Easley, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*David G. Belser for defendant-appellant.*

ORR, Justice.

This case arises out of the shooting deaths of Gerald Allman, Tony Balogh, and Frank Knox. On 11 September 1995, defendant was indicted for three counts of first-degree murder, one count of assault with a deadly weapon with intent to kill inflicting serious injury, and one count of assault with a deadly weapon with intent to kill. Defendant was tried before a jury, and on 27 September 1996, the jury found defendant guilty of all charges. Following a capital sentencing proceeding, based upon the jury's finding defendant guilty of all three murders on the basis of premeditation and deliberation and the felony murder theory, the jury recommended sentences of death for each of the murder convictions. In accordance with the jury's recom-mendation, the trial court entered three sentences of death. The trial court additionally sentenced defendant to 79 to 104 months' impris-onment for the assault with a deadly weapon with intent to kill inflicting serious injury conviction and 31 to 47 months' imprison-ment for the assault with a deadly weapon with intent to kill convic-tion, to be served consecutive to each other and to the sentences of death.

STATE v. DAVIS

[349 N.C. 1 (1998)]

After consideration of the assignments of error brought forward on appeal by defendant and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we find no error meriting reversal of defendant's convictions or sentences.

At trial, the State's evidence tended to show the following: Defendant James Floyd Davis had been employed in the warehouse of Union Butterfield since 1991. On 10 May 1995, an altercation occurred between defendant and two other employees. The management of Union Butterfield, including Herb Welsh, Larry Cogdill, Tony Balogh, and Debbie Medford, conducted a fact-finding meeting concerning the altercation. Defendant was suspended with pay until the following Monday, 15 May 1995. Subsequently, management made a decision to terminate defendant's employment.

On 15 May 1995, defendant met with Tony Balogh and Debbie Medford. During the meeting, Balogh informed defendant that his employment was being terminated. Medford informed defendant of the benefits he was entitled to receive upon his termination. Defendant appeared nervous and tearful during the meeting. Balogh and Medford asked defendant if there was anything they could do for him. Defendant responded by saying, "If you were going to help me, you would have."

On 17 May 1995, at approximately 9:00 a.m., defendant purchased from Pawn World a Winchester .30-caliber M1 carbine rifle, two clips, and ammunition. At approximately 11:20 a.m., defendant entered the facility of his former employer, Union Butterfield, carrying the Winchester rifle and a Lorcin .380-caliber semiautomatic pistol. Defendant proceeded to the break room, where he found Robert Walker, Tim Walker, Howard Reece, Gerald Allman, and Tony Balogh. The men were in the middle of a meeting about the building's sprinkler system. Defendant entered the break room and told Robert Walker and Tim Walker, representatives from the sprinkler company, to "get the hell out of here." Defendant aimed the gun at Allman and fired, shooting him in the head. Defendant then turned to Balogh and fired the gun. Reece ran from the room and felt pieces of the wall hitting him as defendant attempted to shoot him.

Defendant then proceeded down the hallway where the plant management offices were located. He began to fire shots into each office as he walked down the hallway. Larry Cogdill was in an office that he shared with Gerald Allman and Herb Welsh. Cogdill looked

out and saw defendant coming down the hallway and slammed the office door shut. Defendant turned the door handle and opened the door slightly until Cogdill slammed his body against the door to keep defendant out. Defendant then shot through the door, with one bullet striking Cogdill in the arm. Cogdill fell to the side and watched as defendant shot holes in the door. At some point, Cogdill was also shot in the leg.

Defendant continued to move down the hallway, shooting into management offices and reloading his gun at least once. Frank Knox, an employee of Dormer Tools, parent company to Union Butterfield, was working in one of the offices. When Knox heard shots being fired, he hid under his desk. Defendant fired three shots through Knox's door, and two of the shots struck Knox in the wrist and chest.

Defendant returned to the office where Cogdill and Welsh were located and fired several more shots through the door. Defendant then entered the warehouse area of the plant. Larry Short then saw defendant standing in a doorway and smoking a cigarette. Short attempted to flag down cars for assistance. When defendant and Short made eye contact, defendant raised his gun and began firing at Short. Short ducked, ran, and then dove and rolled out of defendant's sight. Soon after, defendant surrendered to the Asheville police.

While in police custody, defendant stated, "I got fired. Damn it. I got set up. They drove me crazy out there." Furthermore, when the arrest warrants for the murders were served upon defendant, he pointed to one of the victims' names on the warrant and stated, "That's the son of a bitch that fired me." While looking at another warrant, defendant stated, "That's a troublemaker. He's made my life hell since I've worked there." Finally, while looking at the warrant for the murder of Frank Knox, defendant stated that he did not remember him.

## I.

[1] First, defendant contends that the trial court committed reversible error in excusing prospective jurors for cause based on their beliefs regarding the death penalty. Defendant argues that the trial court's ruling denied defendant his rights to a fair and impartial jury, to due process of law, and to freedom from cruel and unusual punishment. We do not agree.

The standard for determining whether a prospective juror may be excused for cause for his or her views on capital punishment is

whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). "The granting of a challenge for cause where the juror's fitness or unfitness is arguable is a matter within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion." *State v. Abraham*, 338 N.C. 315, 343, 451 S.E.2d 131, 145 (1994). Prospective jurors with reservations about capital punishment must be able to " 'state clearly that they are willing to temporarily set aside their beliefs in deference to the rule of law.' " *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149 (1986)). This Court has recognized that a prospective juror's bias may not always be provable with unmistakable clarity and that, in such cases, reviewing courts must defer to the trial court's judgment concerning the prospective juror's ability to follow the law. *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990).

In the present case, the trial court did not abuse its discretion by excusing the prospective jurors for cause. Our review of the record indicates that each of the prospective jurors excused for cause stated that he or she would be unable to follow the law and recommend a sentence of death, even if that was what the facts and circumstances suggested. Defendant has pointed to nothing in the record to support his contention. Accordingly, we hold that the trial court did not err in allowing the State's challenges for cause of the prospective jurors. This assignment of error is overruled.

## II.

[2] Next, defendant contends that the trial court erred in conducting an *ex parte* hearing concerning defendant's competency evaluation in the absence of defendant and defense counsel. Defendant argues that he suffered prejudice when the State allegedly handpicked the forensic psychiatrist to evaluate his competency to stand trial, moved the site of the evaluation from Central Prison to Dorothea Dix Hospital, and subsequently utilized the results of that evaluation to cross-examine the defense's psychiatric expert. Specifically, defendant argues that this procedure violated: (1) his unwaivable right to presence at every stage of his capital proceeding and to confront the witnesses against him pursuant to the Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina

**STATE v. DAVIS**

[349 N.C. 1 (1998)]

Constitution; (2) his right to a true, complete, and accurate record of the proceedings pursuant to N.C.G.S. § 15A-1241; and (3) his right to counsel as guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution. Defendant also argues that the cumulative effect of the denial of these rights operated to deprive him of his rights to due process of law. We do not agree.

On 16 October 1995, the State filed a motion for an order directing Dr. Robert Rollins, director of forensic psychiatry at Dorothea Dix Hospital, to examine defendant and prepare a written report describing the state of defendant's mental health. Pursuant to statutory mandate, Judge Loto G. Caviness conducted a hearing on the motion. At the hearing, defendant appeared through counsel. The hearing transcript indicates that both the prosecutor and defense counsel expressed concerns for defendant's capacity to stand trial. After this hearing, defense counsel requested and received an *ex parte* hearing with the trial court. Following these hearings, the trial court entered an order directing defendant's transfer to Central Prison and evaluation by Dr. Rollins of the Dorothea Dix forensic unit. At defendant's request, this order limited the examination to the issue of defendant's competency to stand trial.

Subsequently, on 19 December 1995, Judge Dennis J. Winner entered an "Order to Move Defendant And Assign Specific Forensic Evaluator." In this order, Judge Winner referred to the 16 October 1995 order and explained that

> Dorothea Dix Hospital, Amy Taylor, Forensic Case Analyst, has requested a Court Order assigning Dr. Nicole Wolfe as the forensic evaluator. Ms. Taylor has further requested that the Defendant James Floyd Davis be moved to Dorothea Dix Hospital so that his evaluation can be completed.

Defendant contends that this order was entered after an *ex parte* hearing between the trial court and the prosecutor.

First, we will address defendant's contention that his constitutional right to presence was violated. In *State v. Buchanan*, 330 N.C. 202, 410 S.E.2d 832 (1991), this Court was asked to determine whether defendant's federal and state constitutional rights were violated by conducting bench conferences with defense counsel and counsel for the State outside of defendant's presence. As this Court noted, "the essential characteristic of defendant's constitutional right

**STATE v. DAVIS**

[349 N.C. 1 (1998)]

to presence is just that, his actual presence during trial." *Id.* at 219, 410 S.E.2d at 842. The Court concluded that defendant's state constitutional right to presence is not violated by such conferences "unless the subject matter of the conference implicates the defendant's confrontation rights, or is such that the defendant's presence would have a reasonably substantial relation to his opportunity to defend." *Id.* at 223-24, 410 S.E.2d at 845.

Here, defendant asserts that his right to presence was violated by an *ex parte* hearing concerning his competency evaluation which resulted in the entry of an amended order. First, we note that it is not clear from the record whether an *ex parte* hearing actually occurred. Although an amended order was entered by the trial court, it does not indicate that the State took part in a hearing. In fact, the amended order states that a case analyst at Dorothea Dix Hospital requested a court order assigning Dr. Nicole Wolfe as the forensic evaluator and transferring defendant to Dorothea Dix Hospital. Thus, the amended order appears to be entered upon motion of the hospital, not the State.

Further, the purpose of a competency evaluation is to determine whether defendant is competent to stand trial for the charged offense. N.C.G.S. § 15A-1001 (1997). This determination does not implicate defendant's confrontation rights and does not have a substantial relation to his opportunity to defend. In fact, the competency evaluation is to ensure that a defendant is able "to understand the nature and object of the proceedings against him" before he is "tried, convicted, sentenced, or punished for a crime." *Id.* For the foregoing reasons, we hold that defendant's state constitutional right to presence was not violated by the entry of this amended order.

**[3]** Similarly, defendant's federal constitutional claim is without merit. In *Buchanan*, this Court noted that "the United States Supreme Court has addressed the question of whether defendant has a federal constitutional right to presence in terms of whether the conference at issue involves either the receipt of evidence without an opportunity for cross-examination or the usefulness of defendant's presence in assuring fairness in the proceeding." *Buchanan*, 330 N.C. at 211-12, 410 S.E.2d at 837. Although, unlike the present case, *Buchanan* involved a bench conference, the same analysis applies. There is no proof that an actual proceeding took place, and even if it had, it did not deny defendant an opportunity for cross-examination or necessitate his presence to assure fairness in the proceedings.

[4] Defendant has also failed to establish that the trial court violated N:C.G.S. § 15A-1241 by conducting a hearing without recording the proceedings. First, as noted above, there is nothing in the record which suggests that the trial court conducted a hearing concerning the hospital's request to amend the order. Second, a full record exists concerning the hearing on the State's motion for a competency evaluation. The order entered by the trial court on 16 October 1995 contains all required findings. The modified order entered on 19 December 1995 recites that the hospital requested a change in the forensic evaluator and defendant's relocation. Thus, there is a sufficient record for appellate review.

[5] Defendant also contends that he suffered a deprivation of his right to counsel as guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution. The Sixth Amendment, which is made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. The parallel provision of the North Carolina Constitution, Article I, Section 23, tracks this language. The Sixth Amendment ensures that the accused " 'need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.' " *Estelle v. Smith*, 451 U.S. 454, 470, 68 L. Ed. 2d 359, 373 (1981) (quoting *United States v. Wade*, 388 U.S. 218, 226-27, 18 L. Ed. 2d 1149, 1157 (1967)). Once again, there is no proof that an actual proceeding took place. Further, the amended order does not affect defendant's right to a fair trial.

[6] Finally, because we have found no violation of defendant's constitutional or statutory rights, defendant's argument that the cumulative effect of the denial of these rights operated to deprive him of his rights to due process of law is without merit. Accordingly, this assignment of error is overruled.

## III.

[7] Defendant next contends that his Sixth Amendment right to counsel was violated when the trial court ordered a competency evaluation by a forensic evaluator but declined to allow defense counsel to be present during the examination. Defendant argues that defense counsel's presence would have demonstrated the unreasonable and irrational manner in which defendant related to people and also

would have helped defense counsel in preparing to cross-examine Dr. Wolfe concerning her examination. We disagree.

As noted above, the Sixth Amendment provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. In *Estelle*, the United States Supreme Court determined that defendant's Sixth Amendment right to counsel had attached when he was examined by a psychiatrist. In making the decision whether to proceed with a psychiatric examination, the Court held that "a defendant should not be forced to resolve such an important issue without 'the guiding hand of counsel.' " *Estelle*, 451 U.S. at 471, 68 L. Ed. 2d at 374 (quoting *Powell v. Alabama*, 287 U.S. 45, 69, 77 L. Ed. 158, 170 (1932)). However, the Court noted:

> Respondent does not assert, and the Court of Appeals did not find, any constitutional right to have counsel actually present during the examination. In fact, the Court of Appeals recognized that "an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination."

*Id.* at 470 n.14, 68 L. Ed. 2d at 374 n.14 (quoting *Smith v. Estelle*, 602 F.2d 694, 708 (5th Cir. 1979)).

For the same reasons, we hold that defendant had no constitutional right to have counsel present during his competency evaluation. Here, Dr. Wolfe testified that defense counsel's presence would interfere with the process. She stated that

> [defendant's] concerns about his attorney were the main reason I found him incompetent when I last saw him at Dix, and those are questions that I want to be asking him about, and I think he'd be more likely to tell me about dissatisfaction with his attorneys if they're not present.

Further, it was upon motion of defense counsel that defendant was committed to Dorothea Dix Hospital for examination of his capacity to proceed and sanity. Accordingly, this assignment of error is without merit.

## IV.

[8] Next, defendant contends that the trial court erred in finding that defendant had the capacity to proceed to trial. Defendant argues that there was insufficient evidence to support any of the three prongs of the competency test contained in N.C.G.S. § 15A-1001(a).

N.C.G.S. § 15A-1001(a) sets forth the standard for measuring capacity as follows:

> No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner. This condition is hereinafter referred to as "incapacity to proceed."

N.C.G.S. § 15A-1001(a). "[This] statute provides three separate tests in the disjunctive. If a defendant is deficient under any of these tests he or she does not have the capacity to proceed." *State v. Shytle,* 323 N.C. 684, 688, 374 S.E.2d 573, 575 (1989).

In the present case, defendant was given a competency test on 3 June 1996. Dr. Nicole Wolfe, an expert in the field of forensic psychiatry, testified that she first examined defendant at Dorothea Dix Hospital in January 1996. Following physical examinations, laboratory studies, psychological tests, and a review of defendant's medical records, Dr. Wolfe formed an initial impression that defendant suffered from post-traumatic stress disorder. She also diagnosed defendant as having a schizotypal personality disorder. Subsequently, defendant became increasingly anxious and agitated. On 23 April 1996, Dr. Wolfe determined that defendant was unable to converse in a coherent manner and was incapable of proceeding to trial at that time.

Dr. Wolfe did not see defendant from 23 April 1996 until 3 June 1996 when she met with him at the Buncombe County jail. At that time, defendant expressed distrust of his attorneys. However, Dr. Wolfe testified that defendant appeared to be doing fairly well on the prescribed medications. She also testified that she questioned defendant about his relationship with his attorneys. Dr. Wolfe stated that although defendant exhibited paranoid ideas about his attorneys, he indicated that he had been able to speak with them about his case. She discussed the possibility that defendant might want to obtain different counsel, but defendant declined to do that, stating that he "didn't want to start over."

Dr. Wolfe subsequently testified that when she examined defendant on 3 June 1996, he appeared to understand her explanation of the difference between the question of competency to stand trial and the question of insanity. In Dr. Wolfe's opinion, defendant was capable of

proceeding to trial. She testified that defendant possessed the ability to understand the nature and extent of the charges against him and also possessed the ability to aid and assist his attorneys in his defense. Dr. Wolfe further testified that defendant understood the nature and purpose of the court proceedings, as well as the seriousness of the charges against him. Dr. Wolfe stated that she believed defendant possessed the ability to understand his legal rights and the capacity to give relevant testimony. Dr. Wolfe also testified that the main reason she found defendant incapable of proceeding in April was his paranoia against his attorneys. Based upon the testimony presented at the competency hearing, the trial court concluded that "[defendant] does possess the capacity to proceed to trial at this time" and ordered that the matter proceed to trial.

Defendant now asserts that the record fails to support the trial court's conclusion and that he suffered prejudice when the trial court ordered him to proceed. However, after reviewing the testimony presented at the competency hearing, we do not agree. As noted above, N.C.G.S. § 15A-1001 sets forth the standard for determining capacity to proceed. The evidence must demonstrate that defendant is capable of: (1) understanding the nature and object of the proceedings against him, (2) comprehending his own situation in reference to the proceedings, and (3) assisting in his defense in a rational and reasonable manner. N.C.G.S. § 15A-1001. Dr. Wolfe's testimony clearly indicates that defendant met each prong of the competency test. The trial court properly concluded that defendant possessed the capacity to proceed to trial. Accordingly, this assignment of error is overruled.

## V.

[9] Next, defendant contends that the trial court committed error in allowing the State's opening statement and closing argument to include matters outside of the record. Specifically, defendant contends it was error for the State to argue that defendant understood his rights, because the jury may infer defendant's mental competence based upon the exercise of his constitutional rights.

Arguments of counsel are left largely to the control and discretion of the trial judge, and counsel is allowed wide latitude in the argument of hotly contested cases. State v. Williams, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). Further, the remarks are to be viewed in the context in which they are made and the overall factual circumstances to which they refer. State v. Womble, 343 N.C. 667, 692-93, 473

**STATE v. DAVIS**

[349 N.C. 1 (1998)]

S.E.2d 291, 306 (1996), *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 719 (1997). Where, as here, defendant failed to object to the arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu.* To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair. *State v. Rose,* 339 N.C. 172, 202, 451 S.E.2d 211, 229 (1994), *cert. denied,* 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

In the present case, during her opening statement to the jury, the prosecutor told the jury that defense counsel will "tell you how [defendant] appeared to understand his rights when they were read to him." The prosecutor continued by stating that the jury would hear defendant's comments to law enforcement officers after the arrest warrants were read to him. Further, during closing arguments, the prosecutor stated:

> I told you in my opening everything that would happen and who would tell you what happened in the break room. And I told you how the defendant acted after he murdered those men, how he held that gun by the trigger guard with his little finger and threw it out so the police didn't shoot him graveyard dead.

> And you did hear everything I told you you would hear? I told you [that] you would hear how he understood his rights and when those police officers said, Throw out your weapons and we won't shoot you, after he said, Don't shoot me, and he complied and they did not shoot him.

Defendant asserts that this argument is not supported by the evidence and implies to the jury that it may infer defendant was competent based upon the exercise of his constitutional rights. Defendant cites *Wainwright v. Greenfield,* 474 U.S. 284, 88 L. Ed. 2d 623 (1986), in support of his position. In *Wainwright,* the defendant responded to the officer's *Miranda* warning by stating that he understood his rights and by requesting an attorney. In closing arguments, and over defense counsel's objection, the prosecutor made the following argument:

> He goes to the car and the officer reads him his Miranda rights. Does he say he doesn't understand them? Does he say "what's going on?" No. He says "I understand my rights. I do not want to speak to you. I want to speak to an attorney." Again on [sic] occa-

sion of a person who knows what's going on around his sur-
roundings, and knows the consequences of his act . . . . And here
we are to believe that this person didn't know what he was doing
at the time of the act, and then even down at the station, accord-
ing to Detective Jolley—He's down there. He says, "Have you
been read your Miranda rights?" "Yes, I have." "Do you want to
talk?" "No." "Do you want to talk to an attorney?" "Yes." And after
he talked to the attorney again he will not speak. Again another
physical overt indication by the defendant . . . .

So here again we must take this in consideration as to his
guilt or innocence, in regards to sanity or insanity.

*Id.* at 287 n.2, 88 L. Ed. 2d at 627 n.2.

However, the present case is distinguishable from *Wainwright.*
Here, the prosecutor never directly asked the jury to use defendant's
statements to law enforcement officers in determining defendant's
competence or sanity. The prosecutor's comments also did not indi-
cate that defendant exercised his right to counsel or silence as was
the case in *Wainwright.* Further, unlike in *Wainwright,* defense
counsel did not object to the prosecutor's argument. Finally, prior to
the prosecutor's closing arguments, the trial court in the case *sub
judice* instructed the jury as follows:

I will tell you at this point and I will tell you again when I instruct
you on the law that you are to apply that if during the course of
their arguments one of the lawyers states the evidence a certain
way and you recall it differently, one of your duties as a juror is
to be guided by your own recollection of the evidence. That's why
we've sat here and you've listened to all this evidence as it's being
presented.

When taken in context, the remarks about which defendant com-
plains were not so grossly improper as to require the trial court to
intervene *ex mero motu.* Accordingly, this assignment of error is
overruled.

## VI.

[10] Defendant also contends that the trial court erred in admit-
ting certain evidence about the victim Tony Balogh. Defendant argues
that the evidence admitted pertained to the victim's character and
temperament and is irrelevant to any issue at the guilt phase of the
trial.

**STATE v. DAVIS**

[349 N.C. 1 (1998)]

During direct examination of Debbie Medford, a Union Butterfield employee and the victim's co-worker, the following exchange occurred:

[THE PROSECUTOR]:  Describe Tony's [the victim's] temperament.

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Overruled.

[MEDFORD]:  Tony was—he was a good listener. He was an easy person to work with. He had a lot of concern for the employees at work. He was involved with everybody that worked there. He had an open-door policy. Anytime—

[DEFENSE COUNSEL]: Objection, Your Honor. This is not responsive to the question.

THE COURT:  Well, sustained. I believe she's gone beyond the next question.

The trial court later stated that it was overruling defense counsel's objection "to what's already been testified to."

> Evidence is relevant if it has "any tendency to make the exist-ence of any fact that is of consequence to the determination of the action more probable or less probable than it would be with-out the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Generally, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (1992). We have said that "in a criminal case every circumstance calcu-lated to throw any light upon the supposed crime is admissible and permissible." *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994).

*State v. Macon*, 346 N.C. 109, 115, 484 S.E.2d 538, 541 (1997).

Here, evidence concerning Tony Balogh is relevant in showing the circumstances of the Union Butterfield shootings. A review of the record demonstrates that defendant contended that the victims were not willing to assist him with his difficulties and, indeed, tried to "ruin" him. Thus, the prosecution was properly permitted to present evidence of Tony Balogh's temperament and management style in order to prove the circumstances of the crime, and the evidence introduced was in fact relevant.

Defendant also argues that this error was compounded by the trial court's instruction that the jury could consider evidence from

**STATE v. DAVIS**

[349 N.C. 1 (1998)]

the guilt phase during its penalty phase deliberations. The trial court instructed the jury that

> [t]here is no requirement to resubmit during the sentencing proceeding any evidence which was submitted during the guilt phase of this case. All the evidence which you have heard in both phases of the case remain[s] competent for your consideration and recommending punishment.

As noted above, it was not error for the trial court to admit the evidence during the guilt phase; therefore, its reconsideration during the sentencing phase is also proper.

Finally, defendant contends that even if the testimony was relevant, any minimal probative value was outweighed by the danger of unfair prejudice. However, we do not agree. The testimony presented by Medford was relevant testimony and did not unduly prejudice defendant. This assignment of error is without merit.

## VII.

[11] Next, defendant contends that the trial court erred in admitting hearsay evidence of what victim Tony Balogh and defendant said in a meeting two days prior to the murders. Defendant argues that much of the testimony constituted hearsay and that all of the challenged evidence proved only the victim's good character.

During direct examination by the State, Debbie Medford testified regarding defendant's dismissal conference attended by both Medford and Balogh as follows:

> James [defendant] came in. And he was nervous, a little tearful. He told us that he had missed us, that he was glad to be there, he was glad to see us. He sat down. And Tony told him, he said, "James, I'm sorry. But I'm going to have to terminate your employment."

Defense counsel objected to this testimony, and the trial court subsequently overruled the objection. Medford then continued her testimony in response to an instruction from the prosecutor:

> I can't remember word for word the things that were said. I know that James told him right away that he had gone to the Employee Assistance Program. He wanted him to know that he had done that. And he asked him was there anything that he could do to keep his job.

After Medford's testimony concerning the dismissal conference, the trial court denied defendant's motion to strike.

As we have previously stated, the State is entitled to prove the circumstances of the crime and to introduce evidence tending to support the theory of the case. *State v. Coffey*, 326 N.C. 268, 280, 389 S.E.2d 48, 55 (1990). Here, the conversation between Balogh and defendant showed the circumstances of the crime, particularly the motive for the killings. This crime was committed at defendant's former place of employment, and his victims were former co-workers. The fact that Balogh terminated defendant's employment two days prior to the murder is clearly relevant to show the motive for the crime. Thus, the trial court properly admitted Medford's testimony concerning the dismissal conference.

[12] Defendant also contends that much of Medford's testimony constitutes hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1992). Here, the State never offered Balogh's or defendant's statements to prove the truth of the matter asserted. Rather, the statements were offered to prove defendant's motive for the crime. Thus, the trial court did not err in admitting Medford's testimony regarding the conversation between Balogh and defendant at defendant's dismissal conference.

[13] Finally, defendant contends that even if the testimony was relevant, any minimal probative value was outweighed by the danger of unfair prejudice. However, we do not agree. As noted above, the testimony presented by Medford was highly relevant to the motive of the case and did not unduly prejudice defendant. This assignment of error is without merit.

## VIII.

[14] Next, defendant contends that the trial court erred by allowing State witnesses Howard Reece, Larry Cogdill, and Helen Pittman to read into the record their prior written statements. Defendant argues that the pretrial statements are inadmissible hearsay admitted under the guise of corroboration. We do not agree.

As previously noted, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c). Here, the prior statements were not offered to

prove the truth of the matter asserted, but rather to bolster the testimony given by Reece and Cogdill. "The wide latitude which this jurisdiction grants to the admission of [prior consistent statements] is set forth in recent decisions which state the rule that prior consistent statements are admissible even when the witness has not been impeached." *State v. Martin*, 309 N.C. 465, 476, 308 S.E.2d 277, 284 (1983). This Court has previously stated that

> "prior statements of a witness can be admitted as corroborative evidence if they tend to add weight or credibility to the witness' trial testimony. New information contained within the witness' prior statement, but not referred to in his trial testimony, may also be admitted as corroborative evidence if it tends to add weight or credibility to that testimony."

*State v. Francis*, 343 N.C. 436, 439, 471 S.E.2d 348, 350 (1996) (quoting *State v. McDowell*, 329 N.C. 363, 384, 407 S.E.2d 200, 212 (1991)) (citations omitted). Here, the statements were given by the witnesses immediately after the shooting occurred. Thus, they were the witnesses' present-sense impressions and added weight and credibility to the witnesses' trial testimony.

[15] At trial, defense counsel objected to the reading of the prior statements of Reece and Cogdill, but failed to object to the reading of Pittman's statement. The objection was a general objection to the reading of the statements. Also, for the first time on appeal, defendant has specified statements within each pretrial statement which he claims are prejudicial: the statement of Cogdill that "someone yelled it was James, and apparently everyone figured that Davis would do something foolish after he was fired"; the statement of Reece that "[w]ithin seconds, for no apparent reason, he fired and shot Gerald Allman"; and the statements of Pittman that she "felt like he was out to get revenge and was probably targeting employees both in management and in the warehouse" and that "folks knew that he was going to come back some day and do something." None of these statements was specifically objected to at the time of its reading into the record.

Having not objected to this evidence at trial, defendant alleges this error for the first time on appeal under the plain error rule. The plain error rule holds that the Court may review alleged errors affecting substantial rights even though defendant failed to object to the admission of the evidence at trial. *State v. Cummings*, 346 N.C. 291, 313, 488 S.E.2d 550, 563 (1997), *cert. denied*, —— U.S. ——,

139 L. Ed. 2d 873 (1998). This Court has chosen to review such "unpreserved issues for plain error when Rule 10(c)(4) of the Rules of Appellate Procedure has been complied with and when the issue involves either errors in the trial judge's instructions to the jury or rulings on the admissibility of evidence." *Id.* at 313-14, 488 S.E.2d at 563. The rule must be applied cautiously, however, and only in exceptional cases where, "after reviewing the entire record, it can be said the claimed error is a *'fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.'" *State v. Odom,* 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill,* 676 F.2d 995, 1002 (4th Cir.) (footnote omitted), *cert. denied,* 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). Thus, the appellate court must study the whole record to determine if the error had such an impact on the guilt determination, therefore constituting plain error. *Id.* at 661, 300 S.E.2d at 378-79.

A review of the evidence in the present case reveals that this is not the exceptional case where such a pervasive defect or plain error occurred which would have tainted all results and denied defendant a right to a fair trial. Accordingly, this assignment of error is without merit.

## IX.

[16] Next, defendant contends that his constitutional right to confront his accusers with evidence was violated by the trial court's exclusion of a jail nurse's opinion of defendant's mental condition. We disagree.

Jail nurse Pat Orsban was one of the first medical personnel to evaluate defendant after the shootings upon his admission to the jail. Orsban testified that for about fifteen to twenty minutes, he was in close proximity to defendant and observed that defendant appeared very upset, with rapid speech and mood swings. Based on these visual observations, Orsban circled the term "mentally disturbed" on the jail screening form. Orsban's opinion based on this visual perception is not disputed. However, at trial, defense counsel attempted to elicit a psychiatric diagnosis of defendant's mental condition from Orsban. During defense counsel's questioning of Orsban, the following exchange took place:

Q. Mr. Orsban, as a result of your training as a nurse, your years of experience, your time at Copestone, are you familiar with the term "psychotic"?

A. Yes.

Q. Do you know what that means?

A. Yes.

Q. Do you know what someone who is psychotic looks like?

A. Most of the time.

Q. Based on the time that you saw [defendant] May the 17th, do you have an opinion as to whether he appeared to be psychotic to you?

[PROSECUTOR]: Objection.

THE COURT: Well, sustained.

We disagree that the exclusion of Orsban's opinion violated defendant's constitutional rights to confront his accusers with evidence. Rule 701 establishes the standard for a lay witness' testimony:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (1992). The question posed by defense counsel called for Orsban, a lay witness, to make a psychiatric diagnosis of defendant's mental condition. Orsban was not an expert witness, and no foundation had been laid to show that he had the expertise to make such a psychiatric diagnosis. While it may have been appropriate for Orsban to make a general observation that defendant appeared to be "mentally disturbed" upon admission to jail, it was beyond Orsban's ability as a lay witness to make a specific psychiatric diagnosis of defendant's being "psychotic." Thus, this assignment of error is overruled.

## X.

[17] Defendant also contends that the trial court committed plain error by instructing defendant on his right to testify on his own behalf. Defendant argues that the trial court's instructions overstated the permissible scope of cross-examination to which defendant might be subjected. Thus, defendant contends that the trial court's instructions impermissibly chilled defendant's right to testify.

Defendant cites to *State v. Autry*, 321 N.C. 392, 364 S.E.2d 341 (1988), as support for his position. In *Autry*, this Court held that the following instruction constituted error:

[The prosecutor] could, on good faith, ask you about prior misconduct, whether it resulted in convictions in court if they had some good faith reason to ask those questions, and you would be under oath to answer the questions truthfully.

*Id.* at 402, 364 S.E.2d at 347. This Court stated that "[t]he trial court, though it made an admirable and lengthy effort to explain to defendant his various options, clearly, as to one part, gave instructions inconsistent with Rule 608(b) and therefore committed error." *Id.* at 403, 364 S.E.2d at 347. However, this Court concluded that the error was harmless beyond a reasonable doubt based upon the overwhelming evidence of defendant's guilt. *Id.* The Court further stated:

We hold that, here, where the trial court's error in its instructions to defendant was insulated by defendant's access to and actual conference with his attorney, the trial court's instructional error is harmless beyond a reasonable doubt.

*Id.* at 404, 364 S.E.2d at 348.

Here, the trial court did not make the error discussed in *Autry*. Instead, the trial court correctly instructed defendant on the general rules which guide cross-examination. As this Court has previously noted, " '[t]he bounds of cross-examination are limited by two general principles: 1) the scope of cross-examination rests within the sound discretion of the trial judge; and 2) the questions must be asked in good faith.' " *State v. Larry*, 345 N.C. 497, 523, 481 S.E.2d 907, 922 (quoting *State v. Bronson*, 333 N.C. 67, 79, 423 S.E.2d 772, 779 (1992)), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 234 (1997). In the present case, the trial court did not attempt to give defendant detailed instructions concerning the scope of cross-examination and did not give an instruction inconsistent with any of the Rules of Evidence. Further, as demonstrated by the following exchange, defendant had discussed the consequences of testifying with his attorneys:

THE COURT: Mr. Hufstader, Ms. Burns [defense counsel], I take it you have advised your client about his right to testify and have discussed that with him?

MR. HUFSTADER: We have previously.

THE COURT: I just want Mr. Davis—Mr. Davis, can you hear me, sir?

THE DEFENDANT: Yes, sir.

THE COURT: Have you discussed with your lawyers whether or not you would want to testify in this matter?

THE DEFENDANT: I have.

THE COURT: Do you understand that you have the absolute right to testify, but if you do that you would be subject to cross-examination on a very wide matter of subjects, subject only to the discretion of the Court and the relevancy of this matter? Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: You've elected not to testify.

THE DEFENDANT: I elected not to testify.

Accordingly, we hold that the trial court did not err in its instructions regarding the scope of cross-examination and, thus, did not impermissibly chill defendant's right to testify. This assignment of error is overruled.

## XI.

[18] Next, defendant contends that the trial court erred by failing to dismiss the charge of first-degree murder of Frank Knox based upon the insufficiency of the evidence. Defendant argues there was no evidence from which the jury could find that defendant possessed the specific intent to kill Knox, or any other person. We disagree.

Defendant argues that there is no evidence that defendant bore any malice toward Knox. In his brief, defendant points out that there was no evidence that he knew Knox and that Knox was not present at the dismissal conference discussed above. Defendant notes that when Detective Romick was reading the arrest warrants to defendant, defendant indicated that he knew and was angry at Balogh and Allman, but when defendant was read his third warrant, he said he did not remember Frank Knox. Essentially, defendant's argument appears to be that he had no motive to murder Knox. However, motive is not an element of first-degree murder. *State v. Van Landingham*, 283 N.C. 589, 600, 197 S.E.2d 539, 546 (1973).

Because a specific intent to kill is a necessary constituent of the elements of premeditation and deliberation, proof of premeditation and deliberation is also proof of intent to kill. *State v. Lowery*, 309 N.C. 763, 768, 309 S.E.2d 232, 237 (1983). In discussing premeditation and deliberation, this Court has stated that

> [p]remeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. *State v. Myers*, 299 N.C. 671, 263 S.E.2d 768 (1980). Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Bush*, 307 N.C. 152, 297 S.E.2d 563 (1982).

*State v. Brown*, 315 N.C. 40, 58, 337 S.E.2d 808, 822-23 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

Here, the evidence showed that defendant purchased a semiautomatic weapon the morning of the killings. Defendant then drove to the Union Butterfield facility and killed Balogh and Allman in the break room. He then proceeded down the hallway of management offices, firing shots into the offices as he made his way down the hall. Knox was working at his desk at the time and dove underneath the desk to avoid the shots. As Knox lay behind and underneath his desk, defendant fired at least three rounds through the office door. One round penetrated Knox's wrist and proceeded through his body. After the killings, while his victims bled to death, defendant stood in the doorway of the facility, smoking a cigarette as if nothing had happened. Further, there was no evidence presented that Knox provoked defendant before defendant shot him. Finally, based on the doctrine of transferred intent, as discussed below, a jury could reasonably find that defendant formed the requisite premeditation and deliberation required under first-degree murder. Accordingly, this assignment of error is overruled.

## XII.

[19] Next, defendant contends that the trial court committed plain error in its instructions on lack of mental capacity as a factor tending to negate the specific intent required for first-degree murder.

STATE v. DAVIS

[349 N.C. 1 (1998)]

Defendant argues that the instructions regarding the murder of Knox were clearly erroneous, thus entitling him to a new trial. We do not agree.

In the present case, the trial court instructed the jury on the diminished-capacity defense as follows:

> Members of the jury, you would also consider the charge of first degree murder as it relates to Mr. Frank Knox. Members of the jury, the burden of proof is on the State. And they would have to prove beyond a reasonable doubt each of the elements as I have explained those to you as it relates to Mr. Knox. The defense contends that he shall—that the defendant, Mr. Davis, should be found not guilty of first degree murder by lack of diminished capacity as I've previously instructed you on that. That is, he could not form the specific intent required of first degree murder. If you so find, then you would consider second degree murder. And you would also consider the charge of second degree murder if you have a reasonable doubt as to one or more of the things which the State must prove.

Defendant concedes that he did not object to these instructions at trial. Accordingly, defendant is not entitled to any relief unless any error constituted plain error. *See Odom*, 307 N.C. at 659-60, 300 S.E.2d at 378. We have previously explained that plain error is that error in the instructions which is "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988).

Having reviewed the trial court's instructions on lack of mental capacity under this standard, we find no plain error. Defendant contends there are three separate errors with regard to the trial court's instruction. First, the trial court erred by using the phrase "lack of diminished capacity" as opposed to "lack of mental capacity." Second, the reference "as I've previously instructed you on that" reinforced the error in the diminished-capacity instructions given earlier. Third, the jury was told that if it found that defendant could not form the specific intent to commit first-degree murder, then it could *consider* second-degree murder.

First, the trial court's use of the phrase "lack of diminished capacity" appears to be a mere *lapsus linguae*. As we have previously

stated, "a lapsus linguae not called to the attention of the trial court when made will not constitute prejudicial error when it is apparent from a contextual reading of the charge that the jury could not have been misled by the instruction." *State v. Baker*, 338 N.C. 526, 565, 451 S.E.2d 574, 597 (1994). Here, although the trial court used the term "diminished capacity," it correctly defined the defense by stating that it exists if defendant "could not form the specific intent required of first degree murder." Accordingly, when read contextually, the instructions properly conveyed to the jury what it must find for the defense to apply. Further, the trial court's previous instructions, contrary to defendant's assertions, appear to be correct.

[20] Finally, defendant contends that the trial court instructed the jury that if it found defendant could not form the specific intent for first-degree murder, then it *could* consider second-degree murder. However, the trial court properly instructed that if the jury found defendant could not form the specific intent required for first-degree murder, then it *"would* consider second degree murder." (Emphasis added.) Thus, the trial court properly conveyed the mandatory nature of this instruction. Having reviewed the trial court's instructions on lack of mental capacity, we find no error, much less plain error. This assignment of error is overruled.

## XIII.

[21] Next, defendant contends that the trial court committed plain error in its instructions concerning defendant's diminished-capacity defense with regard to the murder of Tony Balogh. Specifically, defendant argues that the instructions improperly gave the jury the option of finding defendant not guilty if it found that he lacked the mental capacity to commit murder, rather than requiring such a verdict.

The trial court gave the following instructions to the jury with regard to the murder of Balogh:

Now, as to the charge of first degree murder, the defendant[] contend[s] that the defendant should be found not guilty because he lacked the mental capacity at the time of the acts alleged in this case. If you find that there is evidence which tends to show that the defendant lacked mental capacity at the time of the acts alleged in this case, you may find him not guilty of first degree murder. However, if you find that the defendant lacked mental capacity, you should consider whether this condition affected his

ability to formulate the specific intent which is required for conviction of first degree murder. In order for you to find the defendant guilty of first degree murder, you must find beyond a reasonable doubt that he killed the deceased, in this case Mr. Balogh, with malice and in the execution of an actual specific intent to kill formed after premeditation and deliberation as I have defined those terms to you. If as a result of the lack of mental capacity the defendant did not have the specific intent to kill the deceased formed after premeditation and deliberation, he is not guilty of first degree murder. Therefore, I charge that if upon considering evidence with respect to the defendant's lack of mental capacity you have a reasonable doubt as to whether the defendant formulated the specific intent required for conviction of first degree murder, you would not return a verdict of guilty of first degree murder. Now, if you so find you would then consider whether the defendant is guilty of second degree murder.

Once again, defendant concedes that he did not object to these instructions at trial. Accordingly, we must determine whether the instructions constitute plain error. Defendant contends that the trial court's use of the phrase "you may find him not guilty of first degree murder" was ambiguous. He argues that this impermissibly gave the jurors the option of finding defendant not guilty of first-degree murder if they found that he lacked the mental capacity necessary, rather than requiring them to find him not guilty.

" '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " *State v. Holden*, 346 N.C. 404, 438, 488 S.E.2d 514, 533 (1997) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47, 38 L. Ed. 2d 368, 373 (1973)), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 132 (1998). " '[I]n determining the propriety of the trial judge's charge to the jury, the reviewing court must consider the instructions in their entirety, and not in detached fragments.' " *Id.* (quoting *State v. Wright*, 302 N.C. 122, 127, 273 S.E.2d 699, 703 (1981)).

When read in context, the instructions correctly stated the jurors' obligations in determining lack of mental capacity. After stating that the jury "may find him not guilty of first degree murder" if defendant lacks mental capacity, the trial court proceeded to explain to the jury what constituted a lack of mental capacity with regard to first-degree murder. The trial court noted that the jury should consider whether defendant's lack of capacity "affected his ability to formulate the spe-

cific intent which is required for conviction of first degree murder." It was not error for the trial court to qualify what lack of capacity meant in this context. Only if the jury found that defendant could not formulate the required specific intent could it find defendant not guilty of first-degree murder based upon lack of mental capacity. The trial court properly concluded that "if upon considering the evidence with respect to the defendant's lack of mental capacity you have a reasonable doubt as to whether the defendant formulated the specific intent required for conviction of first degree murder, you would not return a verdict of guilty of first degree murder." Thus, when read contextually, the instructions do not amount to error, much less plain error. Accordingly, this assignment of error is without merit.

## XIV.

[22] Defendant also contends that the trial court erred by instructing the jury on the doctrine of transferred intent with regard to the murder of Frank Knox. Defendant argues that there was insufficient evidence to support such an instruction and that the instruction itself was flawed. We disagree.

Under the doctrine of transferred intent:

> It is an accepted principle of law that where one is engaged in an affray with another and unintentionally kills a bystander or a third person, his act shall be interpreted with reference to his intent and conduct towards his adversary. Criminal liability, if any, and the degree of homicide must be thereby determined. Such a person is guilty or innocent exactly as [if] the fatal act had caused the death of his adversary. It has been aptly stated that "[t]he malice or intent follows the bullet." 40 Am. Jur., 2d Homicide, § 11, p. 302 [(1968)].

*State v. Wynn*, 278 N.C. 513, 519, 180 S.E.2d 135, 139 (1971) (citations omitted).

First, defendant argues that the evidence does not support an instruction on transferred intent. In the present case, all of the management offices were located down one hallway. Larry Cogdill, an employee of Union Butterfield, testified that defendant headed straight for that hallway upon entering the building. Once there, he fired into the door of the office that Cogdill shared with Gerald Allman and Herb Welsh. Mary Zellers testified that she was hiding inside the company president's office when defendant fired through the door. Debbie Medford, the personnel administrator of the com-

pany, testified that she was able to escape from her office before defendant reached that end of the hall. In statements to law enforcement officials, defendant stated that the people at Union Butterfield had "ruined" him. He claimed that they had set him up and fired him. Upon his arrest, defendant commented as to one of the victims, "That's the son of a bitch that fired me." Defendant commented about another victim, "That's a troublemaker. He's made my life hell since I've worked there." This evidence demonstrates that defendant's actions were aimed at employees of Union Butterfield, particularly those who were involved in management. Because Knox was working inside management's offices during the shooting, the evidence is sufficient to support the transferred-intent instruction given by the trial court.

[23] Defendant also argues that the instruction on transferred intent was flawed because "it did not specify any intended victim toward who[m] the defendant's malice and intent to kill were allegedly directed." Defendant again concedes that he did not object to these instructions at trial. Accordingly, defendant is not entitled to any relief unless any error constituted plain error. See Odom, 307 N.C. at 659-60, 300 S.E.2d at 378.

In the present case, the trial court instructed the jury on transferred intent as follows:

I would also instruct you on the matter of Mr. Knox that the law is that if a person intends to harm one person and actually harms a different person, the legal effect would be the same as if he had harmed the intended victim. That is, if a killing of an intended person would be with malice, then the killing of a different person is also with malice.

Defendant contends that this instruction is flawed because it does not specify whom the defendant intended to kill.

In discussing the doctrine of transferred intent, this Court has noted that "it is immaterial whether the defendant intended injury to the person actually harmed; if he in fact acted with the required or elemental intent toward someone, that intent suffices as the intent element of the crime charged as a matter of substantive law." State v. Locklear, 331 N.C. 239, 245, 415 S.E.2d 726, 730 (1992) (emphasis added). It is not necessary that the someone be named in the trial court's instructions. Here, the evidence indicates that defendant sought revenge from the management of Union Butterfield because of

his allegedly unjustified dismissal. Thus, the jury was properly instructed on the doctrine of transferred intent based on defendant's intent to harm the management of Union Butterfield. Accordingly, this assignment of error is without merit.

## CAPITAL SENTENCING PROCEEDING

## XV.

[24] Defendant also contends that the trial court erred by allowing hearsay testimony from defendant's sister Violet Bailey during the sentencing proceeding. Specifically, defendant argues that it was error to permit his sister to testify that his mother had told the police that defendant did not suffer any psychological problems from being in the Vietnam War.

During the prosecutor's questioning of Bailey, the following exchange took place:

Q. Ma'am, on the 17th day of May, the day that James Floyd Davis was arrested, the officers went and talked to your mama about 8:00 that evening. Are you aware of that?

A. No, I don't.

Q. So—

A. I might not even have been there.

Q. You might not have been where?

A. At my mama's.

Q. [So you] don't know if the police were talking to your mama any?

A. I was living in Statesville. I come up that next day. I don't know what time I got there. I don't know if I was there with her or not.

Q. Well, do you remember your mama telling them that James—

[DEFENSE COUNSEL]: Objection. She says she wasn't there, Judge.

THE COURT: Well, sustained.

[THE PROSECUTOR]: I'm not asking about that time. She said she may have been there other times. I'm asking if she remembers her mama telling them something.

THE COURT: Ask the question.

Q. [THE PROSECUTOR] Do you remember some of the times when you were there and your mama talked to the officers and her telling them [defendant] didn't suffer any psychological problems from being in the war?

A. No.

Q. You don't?

[DEFENSE COUNSEL]: Objection.

Q. Don't that—

A. No.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. She said she didn't remember.

Defendant argues that such questions were highly improper and were designed to place before the jury clearly inadmissible hearsay. However, defendant's argument is without merit. No improper testimony was admitted, and the jurors heard defendant's sister deny any knowledge of such conversation. Further, upon defense counsel's objection, the trial court noted that the witness "said she didn't remember." Accordingly, this assignment of error is without merit.

## XVI.

[25] Next, defendant contends that he suffered a deprivation of his protection against self-incrimination pursuant to the Fifth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution, as well as his Sixth Amendment right to counsel.

As noted previously, Dr. Wolfe performed a competency evaluation of defendant at Dorothea Dix Hospital. On 23 April 1996, defendant was moved from the hospital to the Buncombe County jail. Subsequently, on 1 May 1996, Dr. Wolfe completed her report and submitted it to the trial court and counsel for both the State and defendant. On 3 June 1996, Dr. Wolfe performed a competency evaluation. Based upon the evidence presented at a subsequent hearing, the trial court concluded that defendant was competent to proceed. On 5 August 1996, defense counsel filed notice of an intent to present a defense of insanity/diminished capacity and to introduce expert testimony relating to a mental disease, defect, or other condition pur-

suant to N.C.G.S. § 15A-959. Also, shortly before trial, defense counsel filed a "Motion to Commit Defendant to Dorothea Dix Hospital for Examination on Capacity to Proceed and Sanity." The motion requested that Dr. Wolfe reevaluate defendant to form an opinion concerning the defenses of insanity and diminished capacity.

On 3 September 1996, defense counsel filed an additional motion to commit defendant to Dorothea Dix Hospital. The motion also noted that Dr. McKee, the defense expert, first examined defendant on 20 July 1996 to determine defendant's competency, criminal responsibility, and mitigation. Dr. McKee examined defendant and ultimately testified for the defense during the sentencing proceeding. Among other things, Dr. McKee testified that he had reviewed defendant's records from Dorothea Dix Hospital and also referred to testing which defendant underwent at Dorothea Dix Hospital. Subsequently, Dr. McKee faced cross-examination concerning the contents of defendant's records from Dorothea Dix Hospital. The cross-examination included discussion concerning the possibility that defendant faked his mental illness by producing invalid results on tests performed at Dorothea Dix Hospital as part of the competency evaluation.

First, defendant asserts that the State's cross-examination of Dr. McKee using defendant's statements from the records of his competency evaluation at Dorothea Dix Hospital violated his privilege against self-incrimination. Defendant asserts that the State requested the evaluation to determine competency and then used the results for a different purpose. Defendant cites *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, in support of his contention. In *Estelle*, the United States Supreme Court found a Fifth Amendment violation when the State, without notice to or knowledge of defense counsel, obtained an order for a competency evaluation of defendant and then utilized the records of that evaluation to prove an aggravating circumstance.

In *Estelle*, the United States Supreme Court noted:

Respondent, however, introduced no psychiatric evidence, nor had he indicated that he might do so. Instead, the State offered information obtained from the court-ordered competency examination as affirmative evidence to persuade the jury to return a sentence of death. Respondent's future dangerousness was a critical issue at the sentencing hearing, and one on which the State had the burden of proof beyond a reasonable doubt. To meet its burden, the State used respondent's own statements,

unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty. In these distinct circumstances, the Court of Appeals correctly concluded that the Fifth Amendment privilege was implicated.

*Id.* at 466, 68 L. Ed. 2d at 371 (citation omitted).

Here, defendant introduced the reports from Dorothea Dix through his expert witness. Dr. McKee's testimony related to defendant's insanity and diminished-capacity defenses. Unlike *Estelle*, this was not a situation in which the State had the burden of proof. In fact, defendant had the burden of proving the defenses asserted by him.

In *Buchanan v. Kentucky*, 483 U.S. 402, 97 L. Ed. 2d 336 (1987), the United States Supreme Court expanded upon its holding in *Estelle* as follows:

"A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." [*Estelle*, 451 U.S.] at 468, 68 L. Ed. 2d [at 372]. This statement logically leads to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Buchanan*, 483 U.S. at 422-23, 97 L. Ed. 2d at 355.

Here, defense counsel participated in the hearing concerning defendant's competency examination and voiced no opposition to the examination so long as the trial court limited the scope of the examination to determining competency. Further, defense counsel then sought to rely on the defenses of insanity and diminished capacity during trial. In forming his opinion, the defense's expert, Dr. McKee, testified that he reviewed defendant's records from Dorothea Dix Hospital and referred to testing done at Dorothea Dix Hospital. Because defendant relied on this evidence at trial, the State should not be foreclosed from also relying on it to rebut defendant's contentions. This is the situation contemplated by *Buchanan*. Accordingly, we hold that defendant's Fifth Amendment right to be free from self-incrimination was not violated by the cross-examination of Dr. McKee.

**[26]** Defendant also contends that he was deprived of his Sixth Amendment right to counsel when defense counsel was not notified in advance that the information generated from the competency evaluation would be used against defendant in the sentencing proceeding. We believe that *State v. Huff*, 325 N.C. 1, 381 S.E.2d 635 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), controls this issue.

In *Huff*, this Court discussed a similar issue and stated:

> In *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, the United States Supreme Court also held that the sixth amendment was violated by the State's introduction of a psychiatrist's testimony at the penalty phase of defendant's trial. The defendant had not placed his mental state in issue and his attorney had neither been informed that the order for psychiatric examination had been entered nor did he have notice that the scope of the examination would include a determination of defendant's future dangerousness.
>
> Although defendant asserts that *Smith* controls the outcome in this case, we disagree. Instead, we find that *Buchanan v. Kentucky*, 483 U.S. 402, 97 L. Ed. 2d 336, also states the principles that control our sixth amendment analysis. The defendant in *Buchanan* argued that his right to counsel had been violated under *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, by the admission of this report. However, the Court held that no right to counsel violation had occurred, and that the fact situation presented in *Smith* was critically different from that presented in *Buchanan*. "In *Smith*, defendant had not received the opportunity to discuss with his counsel the examination or its scope." *Buchanan v. Kentucky*, 483 U.S. at 424, 97 L. Ed. 2d at 356. In contrast, in *Buchanan*, defendant had the opportunity to discuss with counsel the nature of the psychiatric examination; in fact, "counsel himself requested the psychiatric evaluation by . . . [the psychiatrist]." *Id.* In *Buchanan*, the Court said, "It can be assumed—and there are no allegations to the contrary—that defense counsel consulted with petitioner about the nature of this examination." *Id.*

*Huff*, 325 N.C. at 48, 381 S.E.2d at 662.

Similarly, in the present case, defendant had the opportunity to discuss with counsel the nature of the psychiatric evaluation. Indeed,

as defendant notes in his brief, "defendant's attorneys apparently advised him not to discuss the actual facts of the crimes." Defendant argues that defense counsel had no way of knowing that the examination would be used against defendant during the sentencing proceeding. However, this Court noted in *Huff* that

> "the proper concern of this [Sixth] Amendment" does not focus on the potential uses to which the prosecution might put the psychiatric report but on "the consultation with counsel. . . . Such consultation [with counsel], to be effective, must be based on counsel's being informed about the scope and nature of the proceeding [referring to defendant's examination]. . . . To be sure, the effectiveness of the consultation [between defendant and attorney] also would depend on counsel's awareness of the possible uses to which petitioner's statements in the proceeding could be put." *Buchanan v. Kentucky*, 483 U.S. at 424-25, 97 L. Ed. 2d at 357. The Court concluded, "Given our decision in *Smith*, however, counsel was certainly on notice that if, as appears to be the case, he intended to put on a 'mental status' defense . . . , he would have to anticipate the use of psychological evidence by the prosecution in rebuttal." *Id.* at 425, 97 L. Ed. 2d at 357 (footnote omitted).

*Huff*, 325 N.C. at 48-49, 381 S.E.2d at 662 (alterations in original). Here, as in *Huff*, defense counsel should have anticipated the use of the psychological evidence by the prosecution in rebuttal to any defense involving defendant's mental status. Accordingly, this assignment of error is overruled.

## XVII.

[27] Defendant also contends that the trial court erred by failing to intervene *ex mero motu* during the prosecutor's closing arguments in the sentencing proceeding. Defendant argues that the prosecutor's statements were so prejudicial that a new sentencing hearing is warranted. We disagree.

As noted above, arguments of counsel are left largely to the control and discretion of the trial judge, and counsel is allowed wide latitude in the argument of hotly contested cases. *Williams*, 317 N.C. at 481, 346 S.E.2d at 410. Further, the remarks are to be viewed in the context in which they are made and in light of the overall factual circumstances to which they refer. *State v. Hipps*, 348 N.C. 377, 501 S.E.2d 625 (1998). Because defendant did not object to the arguments

STATE v. DAVIS

[349 N.C. 1 (1998)]

at trial, he must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu.* To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair. *Rose,* 339 N.C. at 202, 451 S.E.2d at 229.

Defendant first asserts that the prosecutor improperly urged the jurors to sentence defendant to death on behalf of the victims. Specifically, defendant complains of the following remarks by the prosecutor:

> And I'm urging you on behalf of [Gerald] Allman, Tony Balogh, and Frank Knox—and, again, you will have this question to answer three times. It's the same question. The same factors will be on each sheet—say, yes, the mitigating is insufficient to out-weigh the aggravating. Yes.

> . . . .

> Now, Mrs. Dreher [the prosecutor] and myself are here to speak on behalf of Tony and Gerald and Frank. The folks you've seen here for the last several weeks, Ms. Knox, Tony's boys, Mr. Knox's children, Gerald's family, they relied on the law for justice, and that's why they're here.

> . . . .

> I'm asking you to find the aggravating factors. I'm asking you to answer Issue Three and Four "yes." And I'm asking you to on behalf of Gerald, Tony, and Frank to put James Floyd Davis to death.

In *State v. McNeil,* 324 N.C. 33, 375 S.E.2d 909, (1989), *sentence vacated on other grounds,* 494 U.S. 1050, 100 L. Ed. 2d 756 (1990), the prosecutor told the jury that "[b]eing a prosecutor is not always a pleasant task, for I speak, Mr. Hobgood speaks for two dead ladies who can not speak." *Id.* at 48, 375 S.E.2d at 918. The *McNeil* Court noted that the prosecutor's statement only reminded the jury that he was an advocate for the two victims and concluded that the argument was not so grossly improper that the trial court abused its discretion in failing to intervene *ex mero motu. Id.* In the present case, the prosecutor's remarks similarly reminded the jury that he was an advocate for the State and the victim. Further, nothing in the prosecutor's argument ever suggested or implied to the jurors that they should impose

the death penalty because the victims or their families demanded it. Rather, the prosecutor argued for a death sentence because the law and evidence supported it. For example, the prosecutor told the jurors that he spoke for the victims and their families, but noted that the victims' families "relied on the law for justice, and that's why they're here." After reviewing the statements in context, we hold that the trial court did not err by failing to intervene *ex mero motu*.

[28] Next, defendant contends that the prosecutor improperly utilized biblical arguments throughout the closing argument. For example, the prosecutor argued to the jury as follows:

> And while I am talking about life is never worse, I want to talk a little bit about the Bible. Our Supreme Court doesn't want us to make Biblical arguments. And I don't wish to offend juries. But some of you expressed concerns of that nature. And so I want to say this. You may recall that when Jesus was questioned by the Herodians at the behest of the Pharisees when they were trying to trip Jesus up, they asked him, "Is it lawful to pay taxes to Caesar?" And Jesus said, "Let me see the coin you pay with." And he looked at the coin, and he said, "Whose inscription appears on this coin?" And they said, "Caesar's." And Jesus said, "Then render unto Caesar what is Caesar's and unto God what is God's." And for the purposes of this sentencing hearing, James Floyd Davis belongs to Caesar. You all promised that you would apply the law as it exists in North Carolina, the law of the state, and not some other law and not the law as you wish it was.

The prosecutor also argued that " 'God may have mercy on him because God can do what man cannot.' And man cannot appropriately address what he did at that plant on May 17, 1995, without a death sentence." The prosecutor continued to make biblical allusions throughout the closing argument.

In *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), this Court discussed the bounds of biblical arguments as follows:

> In their arguments before the jury, counsel for both sides are entitled to argue the law and the facts in evidence and all reasonable inferences that may be drawn therefrom. Neither the "law" nor the "facts in evidence" include biblical passages, and, strictly speaking, it is improper for a party either to base or to color his arguments with such extraneous material. However, this

**STATE v. DAVIS**

[349 N.C. 1 (1998)]

Court has repeatedly noted the wide latitude allowed counsel in arguing hotly contested cases, and it has found biblical arguments to fall within permissible margins more often than not. This Court has distinguished as improper remarks that state law is divinely inspired or that law officers are "ordained" by God.

*Id.* at 331, 384 S.E.2d at 500 (citations omitted).

In the present case, the prosecutor did not state that the law of this state is divinely inspired or refer to law officers as being ordained by God. In fact, as defendant points out, "the prosecutor's argument is . . . a jumble of biblical allusions and legal catch phrases, and it is difficult to clearly understand exactly what the source of the argument is." After reading the remarks in context, we conclude that they were not so improper as to require intervention by the trial court *ex mero motu.* However, we do urge caution in the use of biblical phrases and allusions. In closing arguments at the sentencing proceeding, it is the prosecutor's duty to convince the jury that the facts and circumstances of the crime warrant the death penalty. It is not the duty of the prosecutor to preach to the jury, especially in such a convoluted manner. Because we conclude that the trial court did not err by failing to intervene *ex mero motu,* this assignment of error is overruled.

## XVIII.

[29] Next, defendant contends that the trial court committed plain error by instructing the jury that an M-1 .30-caliber rifle is a deadly weapon. Defendant argues that this instruction relieved the State of its burden of proving each element of the (e)(10) aggravating circumstance, that defendant knowingly created a great risk of death to more than one person by means of a weapon or device that would normally be hazardous to the lives of more than one person. N.C.G.S. § 15A-2000(e)(10) (1997).

Defendant concedes that he did not object to these instructions at trial. Accordingly, defendant is not entitled to any relief unless any error constituted plain error. *See Odom,* 307 N.C. at 659-60, 300 S.E.2d at 378.

During the guilt phase of the trial, the trial court instructed the jury on the charge of assault with a deadly weapon with intent to kill inflicting serious injury and the lesser included offense of assault with a deadly weapon inflicting serious injury. In instructing the jury on the elements of these offenses, the trial court noted

STATE v. DAVIS

[349 N.C. 1 (1998)]

that "[a] deadly weapon is a weapon which is likely to cause death or serious bodily injury," and "[a]n M1 .30 caliber carbine is a deadly weapon."

Subsequently, during the capital sentencing proceeding, the trial court instructed the jury regarding the (e)(10) aggravating circumstance as follows:

> Did the defendant knowingly create a great risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more than one person?

> The defendant does so if at the time he kills he is using a weapon and the weapon would normally be hazardous to the lives of more than one person and the defendant uses . . . it in such a way as to create a risk of death to more than one person and the risk is great and the defendant knows that he is thereby creating such a great risk.

Defendant relies on *Sandstrom v. Montana*, 442 U.S. 510, 61 L. Ed. 2d 39 (1979), and *Francis v. Franklin*, 471 U.S. 307, 85 L. Ed. 2d 344 (1985), in support of his position that the previous instructions relieved the State of its burden of proving each element of the (e)(10) aggravating circumstance. In *Franklin*, the United States Supreme Court held:

> Because a reasonable juror could have understood the challenged portions of the jury instruction in this case as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent, and because the charge read as a whole does not explain or cure the error, we hold that the jury charge does not comport with the requirements of the Due Process Clause.

*Franklin*, 471 U.S. at 325, 85 L. Ed. 2d at 360.

However, the trial court's instructions in the present case did not create a mandatory presumption that shifted the burden of persuasion to defendant. The trial court's instructions at the guilt phase of the trial simply informed the jurors that the carbine rifle constituted a deadly weapon as a matter of law, regardless of the weapon's use. The trial court's instructions concerning the (e)(10) aggravating circumstance focused on totally separate issues. In finding this circumstance, the jury must determine whether the weapon in its normal use is hazardous to the lives of more than one person and whether a great

risk of death was knowingly created. *See State v. Rose*, 327 N.C. 599, 605, 398 S.E.2d 314, 317 (1990). Further, this Court has stated that "[a]s to the weapon, the crucial consideration in determining what type of weapon or device is envisioned by G.S. § 15A-2000(e)(10) is its potential to kill more than one person if the weapon is used in the normal fashion, that is, in the manner for which it was designed. The focus must be upon the destructive capabilities of the weapon or device." *State v. Moose*, 310 N.C. 482, 497, 313 S.E.2d 507, 517 (1984). Thus, the fact that a deadly weapon is used by defendant is not enough to support a finding that the (e)(10) aggravating circumstance exists. Accordingly, the trial court's instructions, contrary to defendant's assertions, did not create a mandatory presumption which shifted the burden of persuasion to defendant.

[30] Defendant also contends that the trial court's instructions violated well-settled principles of North Carolina sentencing law. Defendant argues that the trial court, in its instructions, erroneously utilized evidence of the deadly weapon during the sentencing proceeding because it also relied on the use of the weapon to infer malice during the guilt phase. Defendant cites to *State v. Blackwelder*, 309 N.C. 410, 306 S.E.2d 783 (1983), to support this proposition. However, *Blackwelder* involved interpretation of the statutory provisions of the Fair Sentencing Act. The statute involved in *Blackwelder* specifically prohibited utilizing evidence necessary to prove an element of the offense to also prove an aggravating factor. *See* N.C.G.S. § 15A-1340.1 to .7 (repealed 1993). The capital sentencing scheme provided for within chapter 15A of the General Statutes contains no such prohibition. In fact, the statute clearly contemplates a sentencing determination by the jury based on the evidence presented during both the guilt and sentencing phases. *See* N.C.G.S. § 15A-2000(a)(3). Accordingly, this assignment of error is overruled.

## XIX.

[31] Defendant also contends that the trial court erred by submitting both the N.C.G.S. § 15A-2000 (e)(10) aggravating circumstance, that the defendant knowingly created a great risk of death to more than one person by means of a weapon or device that would normally be hazardous to the lives of more than one person, and the N.C.G.S. § 15A-2000 (e)(11) aggravating circumstance, that the murder was part of a course of conduct in which the defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons. Defendant argues that the

circumstances were based on the same evidence and were inherently duplicative on the facts of this case. We do not agree.

"Aggravating circumstances are not considered redundant absent a complete overlap in the evidence supporting them." *State v. Moseley*, 338 N.C. 1, 54, 449 S.E.2d 412, 444 (1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995). This Court has held that it is permissible to use the same evidence to support multiple aggravating circumstances when the circumstances are directed at different aspects of a defendant's character or the murder for which he is to be punished. *State v. Hutchins*, 303 N.C. 321, 354, 279 S.E.2d 788, 808 (1981).

This Court, in discussing the (e)(11) circumstance, has stated that "[e]vidence that a defendant killed more than one victim is sufficient to support the submission of the course of conduct aggravating circumstance." *State v. Conaway*, 339 N.C. 487, 530, 453 S.E.2d 824, 851, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995). Here, the evidence showed that defendant killed three people and injured two others.

Further, in *State v. Smith*, 347 N.C. 453, 496 S.E.2d 357 (1998), in discussing the (e)(10) aggravating circumstance, this Court stated that

[t]his circumstance speaks to a distinct aspect of defendant's character, that he not only intended to kill a particular person when he set fire to the apartment building, but that he disregarded the value of every human life in the building by using an accelerant to set the fire in the middle of the night.

*Id.* at 468, 496 S.E.2d at 366. Similarly, in the present case, defendant not only sought out the management of Union Butterfield during his shooting spree, but also disregarded the value of every human life in the building as he randomly fired into offices while walking down the hall. This aspect of defendant's character is not fully captured by the (e)(11) aggravating circumstance. Based on the facts and circumstances of this case, there was independent evidence to support each of the circumstances submitted, though some of the evidence may have overlapped. Accordingly, it was not error for the trial court to submit both circumstances.

[32] Defendant also contends that the trial court erred by failing to instruct the jury that it could not utilize the evidence of one aggravating circumstance to prove another. However, once again, defend-

STATE v. DAVIS

[349 N.C. 1 (1998)]

ant did not object to the trial court's instruction at trial. Thus, plain error analysis applies. Here, the trial court properly instructed the jury on both the (e)(10) and (e)(11) aggravating circumstances. While we have stated that "trial court[s] *should* . . . instruct the jury in such a way as to ensure that jurors will not use the same evidence to find more than one aggravating circumstance," *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993) (emphasis added), we have not required that trial courts do so. Having reviewed the instructions, we hold that the trial court did not commit plain error by failing to instruct the jury not to consider duplicative evidence with respect to the aggravating circumstances submitted. This assignment of error is overruled.

## XX.

[33] Next, defendant contends that the trial court erred in its instructions to the jury regarding mitigating circumstances. Specifically, defendant contends that "[i]n its initial instructions about statutory mitigating circumstances, the trial court was completely silent about whether those circumstances were deemed by law to have mitigating value." Defendant argues that the instructions given by the trial court allowed the jurors to assign no weight to the statutory mitigating circumstances which the jurors may have found. He also argues that a subsequent instruction by the trial court in response to a question submitted by the jury similarly failed to distinguish between statutory and nonstatutory mitigating circumstances. We do not agree.

Before reviewing defendant's argument, we note that the terms "value" and "weight" which are utilized in separate statutory provisions of our capital sentencing scheme have at times been inadvertently used interchangeably. We take this opportunity to point out the statutory distinction between "value" and "weight" to avoid any misunderstanding in this area of the law. The term "value" is found only in the statutory catchall provision, N.C.G.S. § 15A-2000(f)(9), and has also been applied to nonstatutory mitigating circumstances. The term "weight" or "weighing" is used only in N.C.G.S. § 15A-2000(b)(2) and (3), referring to the process of weighing the mitigating circumstances found against the aggravating circumstances found. In Issue Two, the jury is asked, "Do you find from the evidence the existence of one or more of the following mitigating circumstances?" Under Issue Two, the term "value" is used in the trial court's instructions regarding the statutory catchall, as well as its instructions regarding nonstatutory mitigating circumstances. In both the statutory catchall and non-

statutory mitigating circumstances, the jury is instructed that it must first find that a circumstance has mitigating value before it can answer "yes" to that mitigating circumstance. This is the only portion of our sentencing scheme which involves the term "value."

The term "weight" subsequently comes into play in both Issues Three and Four. In Issue Three, the jury is asked, "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found?" The jurors are then instructed that in answering this question, they must weigh the aggravating circumstance or circumstances found against the mitigating circumstance or circumstances found. In Issue Four, the jury is asked, "Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances you found is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?" The jurors are then instructed that in weighing the circumstances, they may give more weight to one circumstance than another. "Value" does not enter into either Issue Three or Issue Four.

[34] Having clarified this terminology, we turn now to the issue at hand. In the present case, as to each murder, three statutory mitigating circumstances, twenty-six nonstatutory mitigating circumstances, and the statutory catchall were submitted to the jury. The jury was instructed to determine whether any of these circumstances existed prior to answering Issue Two. The three statutory mitigating circumstances submitted were (1) defendant has no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (2) this murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); and (3) the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6). The trial court also submitted the statutory catchall, which provides that the jury may consider "any other circumstance arising from the evidence which the jury deems to have mitigating value." N.C.G.S. § 15A-2000(f)(9).

With regard to the first statutory mitigating circumstance submitted, the trial court instructed the jury as follows:

Now, I would instruct you that the defendant has the burden of proving this and establishing this mitigating circumstance by a

preponderance of the evidence, as I've explained it to you. Accordingly as to this mitigating circumstance[], I charge that if one or more [of] you have found the facts to be as all the evidence tends to show, you will answer "yes" to the mitigating circumstance number 1 on the Issues and Recommendation form. If none of you find this circumstance to exist, you would so indicate by having your foreperson write "no" in that space.

The trial court gave similar instructions regarding each of the two remaining statutory mitigating circumstances.

Prior to listing the nonstatutory mitigating circumstances individually, the trial court instructed the jury as follows:

Members of the jury, you will also—should also consider the following circumstances arising from the evidence which you find have mitigating value. If one or more of you find by a preponderance of the evidence that any of the following circumstances exist and also are deemed by you to have mitigating value, you would so indicate by having your foreperson write "yes" in the space provided. If none of you find the circumstance to exist or if none of you deem it to have mitigating value, you can so indicate by having your foreperson write "no" in that space.

Then, after reading each nonstatutory mitigating circumstance, the trial court further instructed that "if one or more of you find the facts to be as all the evidence tends to show *and* if you determine that this circumstance has mitigating value, then you will answer 'yes.' " (Emphasis added.)

Finally, the trial court instructed the jury on the statutory catchall mitigating circumstance as follows:

Now, members of the jury, I would also instruct you as to number 30. You would also consider and you should consider any other circumstance or circumstances arising from the evidence which one or more of you deem to have mitigating value. If one or more of you do so find by the preponderance of the evidence, you would so indicate by having your foreperson write "yes" in the space provided after this mitigating circumstance, that is number 30, on the Issues and Recommendation form. If none of you find any such circumstances to exist, you would so indicate by having your foreperson write "no" in this space.

Subsequently, in response to a question from the jury concerning the meaning of "mitigating," the trial court stated:

A mitigating circumstance is a fact or group of facts which do not constitute a justification or excuse for a killing or reduce it to a less degree of crime than first degree murder but which may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving of extreme punishment than other first degree murders.

Now, our law identifies several possible mitigating circumstances. However, in considering Issue Number Two, it would be your duty to consider as a mitigating circumstance any aspect of the defendant's character, record or any other circumstances of this murder that the defendant contends is a basis for a sentence less than death and any other circumstances arising from the evidence which you deem to have mitigating value.

First, defendant contends that the trial court erred by simply instructing the jurors to answer "yes" for a given statutory mitigating circumstance if one or more jurors found that circumstance to exist. Defendant argues that the instructions were erroneous because "the trial court was completely silent about whether those circumstances were deemed by law to have mitigating value." Defendant cites *State v. Jaynes*, 342 N.C. 249, 464 S.E.2d 448 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996), in support of his position.

In *Jaynes*, the trial court instructed the jury as follows:

A number of mitigating circumstances listed on the form have been submitted to the jury for its consideration; the same being (1) through and including (37). Now as to these listed circumstances, it is for you to determine from the circumstances and the facts in this case whether or not *any listed circumstance* has mitigating effect. And if one or more of you should determine by a preponderance of the evidence that the mitigating circumstance listed exists and that it has mitigating value, then you would find that it existed and answer so. If none of you finds that, then you would indicate, no, as to that.

*Id.* at 285, 464 S.E.2d at 470 (alteration in original). Subsequently, after the jury submitted a question to the trial court, the trial court informed the jury that it was

not able to answer your question any more clearly than to say that it is for you to determine as a juror whether or not the listed circumstance has mitigating value or effect.

*Id.* This Court concluded that the trial court committed error by combining both the statutory and nonstatutory mitigating circumstances and instructing that "if one or more of you should determine by a preponderance of the evidence that the mitigating circumstance listed exists and that it has mitigating value, then you would find that it existed and answer so."

These instructions improperly placed a higher burden on the jury's finding statutory mitigating circumstances than is required by law. Under our law, in order to find that a statutory mitigating circumstance exists, one or more of the jurors have only to find that it exists factually by a preponderance of the evidence. The jurors are not required by law to determine whether it has mitigating value. As noted above, the only time "value" comes into play is in determining whether the statutory catchall or the nonstatutory mitigating circumstances exist. In order to find that these exist, the jurors must first find that they have mitigating value. By distinguishing between statutory and nonstatutory mitigating circumstances, "[t]he General Assembly has determined as a matter of law that statutory mitigating circumstances have mitigating value." *Id.* This means that jurors are not required to find value as to statutory mitigating circumstances, as in the case of nonstatutory mitigating circumstances. It does not mean that the trial court is required to instruct that statutory mitigating circumstances have value as a matter of law. However, the trial court's instructions in *Jaynes* failed to appropriately distinguish between statutory and nonstatutory mitigating circumstances and, in fact, required the same finding as to both. Accordingly, the Court vacated the defendant's sentence of death and ordered a new capital sentencing proceeding.

In the present case, the trial court properly instructed the jurors from the pattern jury instructions regarding both statutory and nonstatutory mitigating circumstances. *See* N.C.P.I.—Crim. 150.10 (1997). For example, with regard to the first statutory mitigating circumstance, the trial court instructed that "if one or more [of] you have found the facts to be as all the evidence tends to show, you will answer 'yes' to the mitigating circumstance number 1 on the Issues and Recommendation form." With regard to the nonstatutory mitigating circumstances, the trial court instructed the jurors that "[i]f one

or more of you find by a preponderance of the evidence that any of the following circumstances exist and *also are deemed by you to have mitigating value*, you would so indicate by having your foreperson write 'yes' in the space provided." (Emphasis added.) Thus, the trial court properly informed the jurors that in order to find a statutory mitigating circumstance to exist, all they must find is that the circumstance is supported by a preponderance of the evidence. However, unlike statutory mitigating circumstances, the trial court instructed the jurors that in order to find nonstatutory mitigating circumstances, they must (1) find by a preponderance of the evidence that the circumstance existed, *and* (2) find that the circumstance has mitigating value. These instructions properly distinguished between statutory and nonstatutory mitigating circumstances and informed the jurors of their duty under the law. We have upheld instructions virtually identical to the ones given in the present case. *See State v. Conner*, 345 N.C. 319, 480 S.E.2d 626, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 134 (1997); *State v. Simpson*, 341 N.C. 316, 462 S.E.2d 191 (1995), *cert. denied*, 516 U.S. 1161, 134 L. Ed. 2d 194 (1996); *State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995).

In the present case, as noted on the Issues and Recommendation as to Punishment forms submitted for each of the three murders, each of the three individual statutory mitigating circumstances was found to exist by the jury, as well as the twenty-six nonstatutory mitigating circumstances submitted. The only circumstance submitted which the jury did not find was the statutory catchall. Because the jurors found mitigating circumstances to exist, they were required to answer Issue Two "yes." Once Issue Two is answered "yes," the jury then must answer both Issues Three and Four. Here, the trial court properly instructed the jurors in Issue Three that they must "weigh the aggravating circumstance or circumstances against the mitigating circumstance or circumstances." Thus, the jurors were required to take into account any statutory and nonstatutory mitigating circumstance or circumstances they found prior to answering Issue Three. The jurors were also instructed on Issue Four as follows: "In deciding this issue you are not to consider the aggravating circumstances standing alone. You must consider them in connection with any mitigating circumstances found by one or more of you." Thus, the jurors were required to give the mitigating circumstances they had found, both statutory and nonstatutory, weight in determining both Issues Three and Four. Further, the trial court properly instructed that the weight to be given each mitigating circumstance is for the individual

jurors to determine. *See State v. Smith*, 328 N.C. 99, 400 S.E.2d 712 (1991). As we stated in *Daniels*, "[t]hese instructions are in accord with the pattern jury instructions. We conclude that the instructions here were given in accordance with the law and that the jury was able to follow the instructions as they were given." *Daniels*, 337 N.C. at 275, 446 S.E.2d at 318.

[35] Defendant also contends that the trial court erred in instructions given in response to a question sent out by the jury, which stated: "Are the mitigating questions under Issue #2 to be answered yes or no in relation to (1) [b]eing a factor that contributed to the crime on May 17th or (2) [b]eing true that the defense presented this evidence and we agree/disagree to its truth[?]" As noted above, the trial court responded to the question as follows:

> A mitigating circumstance is a fact or group of facts which do not constitute a justification or excuse for a killing or reduce it to a less degree of crime than first degree murder but which may be considered as extenuating or reducing the moral culpability of the killing or making it less deserving of extreme punishment than other first degree murders.

> Now, our law identifies several possible mitigating circumstances. However, in considering Issue Number Two, it would be your duty to consider as a mitigating circumstance any aspect of the defendant's character, record or any other circumstances of this murder that the defendant contends is [sic] a basis for a sentence less than death and any other circumstances arising from the evidence which you deem to have mitigating value.

These instructions track the language of the pattern jury instructions. *See* N.C.P.I.—Crim. 150.10. The instructions provide a general discussion of what constitutes a mitigating circumstance and a summary of what Issue Two is about, that is, considering mitigating circumstances submitted by defendant that would be a basis for a sentence less than death. Generally, these instructions are given in Issue Two, prior to the trial court's instructions on the statutory and nonstatutory mitigating circumstances. In fact, the jurors in the present case had previously received instructions identical to those set out above. However, the instructions above do not affect the trial court's previous instructions, which specifically addressed the distinction between statutory and nonstatutory mitigating circumstances and the method the jury must utilize to find them. In responding to the jurors' question, the trial court elected to reinstruct the jurors using

the pattern jury instructions in an attempt to avoid a misstatement of the law. These instructions do not constitute error.

Further, as this Court has previously stated, " 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " *State v. McNeil*, 327 N.C. 388, 392, 395 S.E.2d 106, 109 (1990) (quoting *Cupp*, 414 U.S. at 146, 38 L. Ed. 2d at 373), *cert. denied*, 499 U.S. 942, 113 L. Ed. 2d 459 (1991). "If the charge as a whole presents the law fairly and clearly to the jury, the fact that isolated expressions, standing alone, might be considered erroneous will afford no ground for reversal." *State v. Terry*, 337 N.C. 615, 623, 447 S.E.2d 720, 724 (1994). When viewed as a whole, the trial court's instructions in the present case properly informed the jurors of their duties under the law. Accordingly, this assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises sixteen additional issues which he concedes have been previously decided contrary to his position by this Court: (1) the trial court erred by denying defendant's motion to prohibit death-qualification of the prospective jurors; (2) the trial court erred by denying defendant's motion to strike the death penalty from consideration; (3) the trial court erred by denying defendant's motion for a bill of particulars regarding aggravating circumstances; (4) the trial court erred by denying defendant's motion for individual, sequestered jury *voir dire*; (5) the trial court erred by giving a blanket instruction that all evidence offered by the State during the guilt phase could be considered as evidence in aggravation during the sentencing phase; (6) the trial court erred by instructing on the definition of mitigating circumstances which did not adequately focus the jury on the culpability of defendant, as opposed to the facts of the murder; (7) the trial court erred by denying defendant's motion to declare the North Carolina capital sentencing statute unconstitutional because it places a burden on defendant to overcome the weight of aggravation; (8) the trial court erred by incorporating the terms "recommend" and "recommendation" when referring to the capital sentencing decision in its instructions; (9) the trial court erred by making jury unanimity a condition to a "no" answer by the jury on sentencing Issue Four; (10) the trial court erred in its instructions on defendant's burden of proof on mitigating circumstances; (11) the trial court erred by permitting jurors to reject submitted nonstatutory mitigating circumstances on the basis that they had no mitigating value; (12) the trial court erred

by using the term "may" in its instructions in sentencing Issues Three and Four; (13) the trial court erred by failing to instruct on the meaning of a life sentence; (14) the trial court erred by submitting aggravating circumstances not supported by the evidence; (15) the trial court erred by denying defendant's motion to strike the death penalty; and (16) the trial court erred by making jury unanimity a condition to a "no" answer by the jury on sentencing Issues One and Three.

Defendant raises these issues so that this Court may reexamine its prior holdings and also to preserve the issues for any possible further judicial review. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[36] Having found no error in either the guilt or sentencing phase, we must determine whether: (1) the evidence supports the aggravating circumstances found by the jury; (2) passion, prejudice, or any other arbitrary factor influenced the imposition of the death sentence; and (3) the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of three counts of first-degree murder on the basis of malice, premeditation, and deliberation and also under the felony murder rule. With respect to each murder, the jury found the aggravating circumstances that the defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person, N.C.G.S. § 15A-2000(e)(10), and that the murder was part of a course of conduct in which the defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

We conclude that the evidence supports each aggravating circumstance found. We further conclude, based on a thorough review of the record, that the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor. Thus, the final statutory duty of this Court is to conduct a proportionality review.

**[37]** Proportionality review is designed to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In conducting proportionality review, we determine "whether the sentence of death in the present case is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). It is also proper for this Court to compare this case with the cases in which we have found the death penalty to be proportionate. *Id.* at 244, 433 S.E.2d at 164. Although we review all of these cases when engaging in this statutory duty, we will not undertake to discuss or cite all of those cases each time we carry out that duty. *Id.*

This Court has determined that the sentence of death was disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

However, we find that the present case is distinguishable from each of these seven cases. First, defendant was convicted of three counts of first-degree murder. As this Court has previously noted, we have never found the sentence of death disproportionate in a case where the defendant was found guilty of murdering more than one victim. *State v. Goode*, 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995). Further, the jury convicted defendant on the theory of malice, pre-

meditation, and deliberation and also under the felony murder rule. We have said that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *Artis*, 325 N.C. at 341, 384 S.E.2d at 506.

We recognize that juries may have imposed sentences of life imprisonment in cases which are similar to the present case. However, this fact "does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. This Court has long rejected a mechanical or empirical approach to comparing cases that are superficially similar. *State v. Robinson*, 336 N.C. 78, 139, 443 S.E.2d 306, 337 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). "We note that in deciding whether a death sentence is disproportionate, this Court independently considers each individual defendant and the nature of the crimes that defendant has committed." *State v. Lynch*, 340 N.C. 435, 483, 459 S.E.2d 679, 703 (1995), *cert. denied*, 517 U.S. 1143, 134 L. Ed. 2d 558 (1996).

The evidence in the present case shows that defendant engaged in a shooting rampage at the Union Butterfield facility which resulted in the murder of three employees, as well as the wounding of two others. Defendant fired multiple rounds from two semiautomatic weapons throughout the facility as employees hid under desks or fled the building in fear for their lives. With the killings completed, defendant stood in the doorway, smoking a cigarette.

Based on the nature of this crime, and particularly the distinguishing features noted above, we cannot conclude as a matter of law that the sentences of death were excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error.

NO ERROR.

Justice WYNN did not participate in the consideration or decision of this case.